## TUNISON *vs.* TUNISON.

*In the matter of proving the last will and testament of* GEORGE M. TUNISON, *deceased.*

WHERE the testamentary declaration and the request to the subscribing witnesses to attest the instrument, were made by means of questions put by the counsel attending the execution of the will, and the affirmative response of the testator,—*Held*, that the forms prescribed by the statute were satisfactorily complied with.

When there is room for doubting the strength of the testator's capacity, and for suspecting improper influences brought to bear on his volition, his previous declarations as to his testamentary intentions may be received in evidence ; but they diminish in importance as the grade of capacity increases, and have no value whatever where the mind is sound and vigorous.

If the testator's bequests exceed the amount of his estate, such a fact might aid in determining a case of doubtful capacity, but of itself it is not sufficient to impeach the testator's soundness of mind.

There is nothing unlawful in suggestion, provided it be not carried to the degree of importunity, and the testator be in the full possession of his faculties.

A will contested on the ground of undue influence, admitted to probate.

CHARLES EDWARDS, *for Executor.*

I. The whole question is upon the instrument now propounded. No other will is set up.

II. The only legitimate testimony is that which can be made to bear upon this will ; and much, that can have no such weight, has been allowed to come in. (*Bunyard* vs. *McElroy*, 21 *Ala.*, 311 ; *Jackson* vs. *Kniffen*, 2 *J. R.*, 31).

III. The charge of undue influence has not been made out at all.

An influence to vitiate must amount to force and coercion, destroying free agency,—a deprivation of the free exercise

of a testator's own will, tantamount to force and fraud. In fact the deceased's own mind must not have *willed* the bequests. (*Williams* vs. *Goude*, 1 *Hagg*, 581; *Bird* vs. *Bird*, 2 *Ib.*, 142; *Floyd* vs. *Floyd*, 3 *Strobhart*, 44; *Potts* vs. *House*, 6 *Georgia R.*, 324).

There is no proof that he was coerced, by dissuasion or argument, from disposing; and if he were, this would not amount to undue influence. (*Gilbert* vs. *Gilbert*, 22 *Ala.*, 529). Nor would suggestions of the widow (even if proved) be sufficient to impeach this will. (*Creely* vs. *Ostrander*, 3 *Bradf.*, 107; *Bird* vs. *Bird*, *suprà*).

Undue influence is not to be inferred, especially through kindly acts or favorable bequests. (*Weir* vs. *Fitzgerald*, 2 *Bradf.*, 67). Disputes and unhappiness between man and wife are antagonistical to the idea of undue influence by the woman on the man, *especially when none of the bickerings have any relation to any will.*

The fact that the wife's relations are remembered, almost to the same extent as the husband's, cannot possibly carry with it *any legal notion of undue influence*, especially when the testimony shadows forth the fact that the deceased had a desire to treat them about equally, and which he has done.

1. The mere fact that the mind of a testator had been influenced by the arguments or persuasions of the person to be principally benefited by the will, however indecorous, indelicate or improper they may be, will not, ordinarily, in the absence of fraud, vitiate a will. (*Newhouse* vs. *Godwin*, 17 *Barb.*, 236).

2. The constraint which will avoid a will must be a present one, operative on the mind of the testator in the very act of making the testament. Threats and violence, or any undue influence being past and gone, and in no way shown to be connected with the testamentary act, are not evidence to impeach a will. (*McMahon* vs. *Ryan*, 20 *Penn.*, [8 *Harris*,] 329).

3. A will made by a wife in favor of a husband, cannot be impeached on the ground of general bad treatment. (*Ib.*)

IV. The idea of incompetency only shows to what a small plank the contestant is driven.

Former notions about a testamentary act, never carried out, have no force here. Nor is there anything in a belief that, had the deceased made his will away from a sick bed, 1 would have added to or altered or made it variant from the instrument propounded. This presumption or speculative belief can have no force against a solemnly executed instrument carrying all legal appliances and made by a man of mature mind, who dictated all the bequests.

Everything showed competency of mind : he desired to make his will ; he gave full instructions ; they were put in shape and read to him ; he understood them all.; and then suggested an idea that he might like to make a variance in a part, but on its being explained to him he waived it, and did not require any alteration, and after all this signed every sheet, writing his name in full, and duly perfecting it by admission and declaration, and seeing all the witnesses sign. And so well able was he to sign, that he cheerfully remarked about the roughness of the signature, adding he believed nevertheless that it would answer for the signature of George M. Tunison.

The competency remained up to a time beyond the execution, and puts the broad seal of knowledge and free agency upon the whole, through the testimony of Mr. Denham. The great objection to the will appears to be in the fact that the twenty houses are devised to the wife, and that this the testator could not have intended. Mr. Denham says, " He said he wanted to tell me what he had done, said, ' I have made my will,' and added that the houses in Twenty-second Street all went to his wife, and he wished me to continue the charge of them, to collect the rents of all, and pay them to his wife, and see that the houses were well taken care of. ' The other houses,' said he, ' go to different ones, and I don't know whether you will have anything to do with them.' And that the book concern down town, of Tunison and Reeve, was to remain as it was for the term of the lease, and that also went to his wife."

1. A will duly and solemnly made by a man of sound mind and memory cannot be defeated by proof that his intentions were different at a previous time. (*Morris* vs. *Sheppard*, 20 *Penn.*, [8 *Harris*,] 475).

2. The mere omission of a testator to make any provision for a child (and surely not then of a father), is not of itself a ground for impeaching his testamentary capacity. (*Kirkwood* vs. *Gordon*, 7 *Richardson's R.*, 474).

V. The evidence against the widow should be taken with some doubt.

The servant girl produced against us, shows that Mr. and Mrs. Tunison loved one another; and she does not prove any undue control.

One of the brothers allowed his own child to be brought up by the widow. He himself, since giving testimony, has eaten of her bread and slept at her house. And it cannot be denied that the father has also gone to the same church and sat in the same pew with the widow, and visited the grave of the deceased with her since the opposition made to this will; while the testimony of Mr. Reeve, Mr. Denham, Mr. and Mrs. Sutherland, and Mr. Moore, destroys all the counter-testimony. And the widow feels, as does her advocate, that the strongest proof of love and the dearest and most valued legacy that she received from her husband was embraced in this incident and these words : "About a quarter of an hour or twenty minutes before he died, he called his wife to him and said he wanted to kiss her : he put his hands around her neck, drew her face down to his and kissed her, and said, ' *This is from my heart, and it's the last.*' "

VI. All the formalities of the law were complied with—the subscribing witnesses were unimpeached and unimpeachable. One of them has not been attempted to be cross-examined (the professional man who drew the will), and, therefore, his deposition remains intact.

The cross-examination of the other two (minister and phy-

sician) confirms the fact of due execution in all its legal for-malities.

1. When a will is signed, with the proper solemnities, and in the usual manner, the testator declaring that he published the same as his last will and testament, the presumption is that he knew the contents. (*In re Maxwell's Will*, 4 *Halst.*, 211).

2. If a will be read over to the testator, and he approves it understandingly, by executing it, previous verbal instructions to the draftsman are thereby superseded. (*Whitlock* vs. *Wardlaw*, 7 *Richardson, S. C.*, 453).

VII. The uncharitable opposition here made should subject the party interposing it to costs ; at any rate, he should not be allowed any costs or fees out of the fund. (*Bird* vs. *Bird*, *suprà.*)

A. V. W. Van Vechten,
B. S. Kissam, *for Contestant.*

I. The instrument propounded for probate was not execu-ted in accordance with the statute.

1. The testator did not declare it to be his last will and testament.

2. The testator did not request the witnesses to sign. (2 *R. S., p.* 63, 124, § 33 ; *Lewis* v. *Lewis*, 1 *Kern.*, 223, 4, 6, 7; *Ex parte Beers*, 2 *Brad.*, 163, 4 ; *Wilson* v. *Hetterick, id.* 427 ; *Burritt* v. *Silliman*, 16 *Barb.*, 210, 11; *Seymour* v. *Van Wyck*, 2 *Seld.*, 120.)

II. The testator was not in *all respects competent* to make a will—especially a will of such great length and multi-farious details—he was so deficient in memory as to be una-ble to recollect his own father and sister, brothers and other blood connections, or the amount of his personal property, or his debts. (1 *Jarman on Wills, pp.* 50, 51 ; *Van Alst* v. *Hunter*, 5 *J. C. R.*, 160 ; *Mountain* v. *Bennet*, 1 *Cox, Ch. C.*, 353 ; 2 *R. S.*, 57, 118, § 1 ; *p.* 58, 120, § 10 ; *p.* 60, 121, § 18 ; *Clarke* v. *Fisher*, 1 *Paige*, 171 ; *Clarke* v. *Sawyer*, 2

*Barb. C.*, 411; *S. C.*, 2 *Coms.*, 498; *Williams on Ex'rs, p.* 40, 41, *3d. Am. Ed.*)

III. The testator was under restraint; there was an undue influence exercised over him by his wife. (2 *R. S., p.* 58, § 10; *Burger* v. *Hill,* 1 *Brad.*, 360, 4; *Mowry* v. *Silbur,* 2 *id.*, 133, 147, 149, 151, 152; *Vreeland* v. *McClelland,* 1 *Brad.*, 393; 3 *id.*, 507; *Clarke* v. *Fisher,* 1 *Paige,* 171; *Clarke* v. *Sawyer,* 2 *Barb. Ch.*, 411; *S. C.*, 2 *Coms.*, 498.

*Facts* and *circumstances* are the *primary evidence* on which to rely, and not *opinions* of witnesses. (*Browne* v. *Molliston,* 3 *Wharton,* 137; 1 *Jarman on Wills, p.* 79, 80).

The mind may be turned by *moral* and *physical* coercion. (*Thompson* v. *Farr,* 1 *Spear's R.*, 108, 110, 111).

If he did the act merely *for sake of peace* it is tantamount to *force* and *fear.* (*Williams* v. *Goude,* 1 *Hagg. Ecc. R.*, 581; *Constable* v. *Tufnell,* 24 *id.*, 485).

If he was *too weak to resist* importunity, it destroyed his free agency. (*Kinleside* v. *Harrison,* 2 *Phill.*, 551, 2).

So, if *harassed* into *submission* by *continued* and *excessive importuning.* (*Martin* v. *Teague,* 2 *Spear's R.*, 268; *O'Neill ads. Farr,* 1 *Richardson,* 84).

The testator should enjoy full liberty and freedom, and possess the power to withstand all contradictions and control. (*Davis* v. *Calvert,* 5 *Gill. & John.*, 302, 303; *Small* v. *Small,* 4 *Greenl.*, 223).

A dominion sufficient to prevent the exercise of a discretion will avoid it. (*Mountain* v. *Bennett,* 1 *Cox,* 355).

Persuasion on death-bed may amount to force. (1 *Jarman on Wills, p.* 39, 40, 2*d Am. Ed.*; 1 *Williams on Exr., p.* 40).

Where the will is written, *or procured to be* written by a person benefited by it, the court will make stricter scrutiny and require stricter proof of volition and capacity. (1 *Jarman on Wills, p.* 40, 41.)

As to the admissibility and competency of testimony. (*Waterman* v. *Whitney,* 1 *Kern.*, 157; *Moore* v. *Moore,* 2 *Brad.*, 261.)

IV. The probate should be denied.

THE SURROGATE.—The testator, by his will, executed the 24th day of July, 1856, the day of his death, gave to his wife the dwelling house No. 179 West Sixteenth Street, where he resided at the time of his death, with the household furniture, twenty lots and houses on Twenty-second Street, between the Seventh and Eighth Avenues—and also the general residue of his estate, after the following devises and bequests, viz. to Mrs. Eleanor Grotecloss, house and lot No. 127 Sixteenth Street; James Hodge, house and lot, No. 125 Sixteenth Street; Edward Grotecloss, lot of land in Market Street, Newark, New Jersey; John Grotecloss, lot at Somerville, New Jersey; James Hodge, leasehold lots in Fourteenth street, stock in trade and implements; of the Bailey Manufacturing Company stock, $1000 to John Grotecloss, $1000 to Edward Grotecloss, $1000 to the executor George G. Smith, $1000 to William Grotecloss, $2000 to George M. Tunison, $1000 to Harriet Grotecloss, $1000 to Mary A. Dissosway, $5000 to Tunis Tunison, $2000 to Rachel Ann Hodge; of the Mohawk River Mills' stock, $1000 to John C. Tunison, $1500 to Cornelius Henry, Jacob and Isaac Tunison, and $2500 to the Twenty-third Street Presbyterian Church; $500 to John W. Consall; $800 to Mary E. Smith; $800 to Elizabeth Smith; $500 to Robert G. Smith; $500 to Perry Anderson; $200 to Mary Watson; $100 to Mary, Agnes and Elizabeth Watson, each; $1000 to George G. Smith; $2500 to Peter V. W. Bishop; $1000 to James Pringle; $500 to Louisa Tunison.

The first objection made to the probate, relates to the formal execution of the will, which, it is insisted, was defective for want of a sufficient testamentary declaration, and a request to the subscribing witnesses to attest the instrument. The will was dictated by the testator and was read over to him before execution, in the presence of all the witnesses. The Rev. Mr. Clark testifies that Mr. Edwards, the counsel who

drew the will, asked the decedent, "Do you acknowledge this to be your last will and testament, and wish us to sign as witnesses?" and that the decedent responded affirmatively. Dr. Watts, the attending physician, testifies to the same effect. I think these forms entirely sufficient to satisfy the requisitions of the statute. The instrument was read aloud in the presence of all the parties, the testator was asked if he declared it to be his will, and wished the persons indicated to be the subscribing witnesses, and he said, yes. He signed the instrument on the margin of every page, and the witnesses attested it in his presence. Nothing more could be required. There was a testamentary declaration which he made his own by an affirmative response, and he adopted in the same manner the request to the subscribing witnesses. It is not technically necessary that the testator, in the performance of testamentary ceremonies, should of himself, and without the aid or intervention of others, comply with the requisitions of the statute—but the transaction may be performed by interrogations put by others, and a satisfactory reply given by him. I have no doubt whatever on this point, and must therefore overrule the formal objections taken to the mode of exec uting the will.

It is urged, however, that the instrument is invalid by reason of undue influence exercised by Mrs. Tunison over her husband, the testator. There is no pretence of fraud or circumvention, but merely an allegation of improper influence. The existence of an influence sufficient to accomplish such a purpose is sought to be established by particular instances of its exercise, when the decedent was in a state of perfect health. In this respect the effort entirely failed,—that is, in showing that the decedent at any time succumbed, in his usual avocations or ordinary business affairs, to a superior mental influence. On the contrary, I think that on the particular occasions which have been made the subject of criticism, he acted independently and according to his own views. Thus, for example, Mrs. Tunison's refusal to sign the deed of the Brooklyn property was eventually relinquished,

and her opposition to the partnership her husband proposed
to form with his nephew, was unavailing to prevent its con-
summation.  These circumstances may bear on the question
of interference in his business affairs, but they certainly do
not establish a power on her part to direct or control her
husband's actions.  In this connection I may allude to the
wish expressed by Mr. Tunison the night before he died, to
his nephew James Hodge, that he would keep by him and
have ink and paper ready for a will, and " say nothing about
this to any one."  From this the counsel inferred a desire to
keep secret from his wife his proposed dispositions, or to
escape her presence, but it may just as easily be referred to
disinclination to alarm her as to his condition.  It shows,
however, that of his own spontaneous motion he intended to
make a will.

Evidence was offered on the trial for the purpose of indi-
cating the improbability, that the decedent made the testa-
mentary provisions in the will in favor of his wife, of his own
free and unbiased volition.  The family differences exposed
with this object by no means sustain this position.  In draw-
ing aside the veil which covers the privacy of domestic life,
infirmities of temper and household difficulties, though con-
doned from time to time, still when collected together and sifted
out of the experience and intercourse of years, may appear
in the aggregate somewhat formidable.  The rough places
are always salient and observable—the smooth attract little
attention.  Sudden betrayals of temper may be marked,
while the ordinary course of good feeling passes comparatively
unnoticed, and affection modestly shrinks from being demon-
strative when observed.  These parties had been married
twenty years, they were without children to inherit their
property, and their respective relations might form expecta-
tions of future benefactions.  The evidence on the subject
of the alleged differences has been mainly drawn from the
relatives on the husband's side, who have been disappointed
in realizing the extent of their expectations.  There was no
complaint by Mr. Tunison on any point affecting in the

slightest degree the character of his wife; and there is no proof that the difficulties claimed to have existed, were ever revealed beyond the sphere of the family circle. I think their importance has been over-estimated—they certainly never came to any head,—and in view of the evidence of witnesses who testified that the parties lived together happily, of the decedent's character and disposition, his letters to his wife, which have been produced before me, and the last tokens of his affection for her with his departing breath on his death-bed, I cannot but conclude, that whatever disagreements there may have occasionally been, they do not appear to have been sufficiently grave, in moments of calmness and reflection, to have influenced permanently his feelings, or to have affected disadvantageously his testamentary intentions.

Various statements have been given of his declarations, from time to time, in relation to the disposition of his property by will. Such declarations are undoubtedly receivable, where there is room for doubting the strength of the testator's capacity, and for suspecting improper influences brought to bear on his volition, but they diminish in importance as the grade of capacity increases, and have no value whatever where the mind is sound and vigorous. It is not uncommon for persons of a generous disposition, without children, and with relatives not affluent, to talk freely in regard to testamentary intentions. Withal, a fortune rapidly acquired, tends, under such circumstances, to promote this class of declarations. Such general and loose statements, however sincerely made at the time, show no settled scheme or plan, and cannot impeach a will celebrated with the requisite legal solemnities, by a testator of undoubted capacity. In all the evidence given on this point, it does not appear that the decedent at any time proposed to cut off his wife merely with her right of dower in his estate, while on one occasion he seems to have contemplated giving her $50,000, a sum not far from the value of the devises to her contained in the will, after deducting the heavy incumbrances upon the property. But still in any event, whatever may have been his

previous design and plans, and even had there been clear and specific evidence of intentions in regard to his wife, far more unfavorable than have been suggested—or, to put the case still stronger, had these declarations been incorporated in a previous will duly executed—such a state of facts would not have weighed against the validity of the last will, unless there were some other and independent ground for impeaching that instrument.

The case then is narrowed down to the consideration of the events connected with the *factum* of the will, and the state of the testator's mind at the time of the execution.   It is insisted that the bequests contained in the will exceed somewhat the amount of the decedent's personal estate, after the payment of his debts.   This often happens, and though such a fact might be adminicular proof to help in determining a case of doubtful capacity, yet, standing alone by itself, it is not sufficient to impeach the soundness of the mind or memory.   The decedent was engaged in active business : it does not appear that at the time of dictating the will he summed up either his debts, or the legacies, or the amount of his personal property.   In the absence of such a comparative statement, the mistake, if it be one, might readily have occurred without faulting his capacity.   But let us see what positive indications there were of an irrational or weakened mind.

Now it is especially observable that the disease of which the decedent then lay ill was not of such a character as to affect the functions of the brain.   There was no sign of cerebral or mental disturbance.   His mind was clear and intelligent.   The course of the malady was sudden and quick, and his strength of body was great even shortly before decease.   There can be no doubt on these points.   Three professional gentlemen of high intelligence and respectability were present at the transaction—a clergyman, a physician, and a lawyer.   Numerous persons were around the decedent before and after the occurrence.   A large circle of friends was collected about his dying bed.   Not a single person,

however, is to be found to whisper a doubt as to his competency to the last. He dictates the several provisions of the will, makes numerous bequests among his wife's relations and his own, and is not forgetful of dependents or of friends. In this last act of his generosity, he desires not to overlook any one, and asks for suggestions of names which in the anxieties of the moment may escape him. And here we approach the point where direct interference on the part of his wife is alleged. The proofs show that as various provisions directing gifts to some of the numerous legatees were dictated by the testator, Mrs. Tunison made exclamations, interruptions and comments, the particular character of which is not clearly exhibited, but which it seems were in the nature of objection or remonstrance. In one case the words she used were "Give it to me, and I will give it to them,"—this was a disconnected sentence, overheard by a person in the adjoining room, and it is impossible to say to what part of the testator's property, or to what proposed bequest it applied, or what was the effect of the request. The first remark I would make upon these circumstances is in favor of the liberty of suggestion—where it is not carried to the degree of importunity, and provided the testator be in the full possession of his faculties. There is nothing unlawful in mere suggestion, when it offers ideas to a sound mind, for reception or rejection, according to its free volition. Again, I cannot but notice the entire absence of any indications that in a single instance any bequest mentioned or proposed by the decedent, was modified or abandoned in consequence of Mrs. Tunison's objections. It is manifest, therefore, that the wishes of the decedent, so far as expressed, were not disturbed or restrained from their full gratification by anything that emanated from his wife. Whatever he dictated took effect without regard to any objection that may have fallen from her. But it is especially worthy of notice, that in the point of most interest to the wife, that in which she was personally concerned, the provision for herself, she does not appear to have interfered by the expression

of a wish, thought or suggestion of any kind. There is nothing to convey a doubt that this portion of the will was other than the spontaneous offspring of his mind and his heart. It is true that when the will was engrossed and read to him, he stated that he wished the devise to his wife modified, so as to give her only a life-estate in the property, with remainder in fee after her decease to his relatives and her relatives. On learning from the counsel who had drawn the instrument, that such a change would lead to essential modifications in the form of the will, he abandoned the idea, and executed the will as it stood. Even here, at this critical point, where there was temptation to selfishness, if it existed, to interfere in its own behalf, no objection seems to have escaped her lips. The dying man was left unbiased to determine of his own choice the extent of his dispositions in favor of his wife, and he did determine—" well, let it go," was his expression ; he was " satisfied with the will as it stood." In this she acquiesced ; she said she was satisfied, and so it stood, and was executed. Two hours after this was accomplished, he sent for his agent, Mr. Denham, bade him farewell, and when the latter had retired into an adjoining room, recalled him, stated with clearness the provisions in favor of his wife, and requested him to continue his agency and charge of the property devised to her. He told James Hodge, one of the devisees, what gift he had made to him, and gave him his parting advice. When Mr. Moore called to see him, he rose in the bed with his own strength and grasped him by the hand. He conversed rationally of his approaching dissolution and his religious hopes, and a few minutes before his departure bade his wife farewell in a manner most touching and tender ; and then he died.

So far as consistent with a death-bed will, this instrument was made with care and deliberation. It bears the impress of a generous disposition, mindful in a large degree of the claims of relatives and friends ; and though all expectants have not been gratified, it does not appear that any were excluded whom he desired to remember. He enforced the

devise to his wife shortly before his death, by the instructions given to his agent, and he died with every mark of affection for her. His mind was sound, without a trace of weakness or aberration, and though, perhaps, under other circumstances, and with more time for reflection, he might have made different dispositions, yet there can be no doubt that this was his last will—his last wish—and as such received his solemn ratification. There was no superior force or influence exerted over his mind by any palpable act: his faculties were unimpaired by disease, and in all their vigor: and to attempt to disturb this disposition, for such slight and insufficient reasons as have been urged against the probate, would be entirely unjustifiable. I must therefore pronounce sentence in favor of the will.