benefit. and the proceeds of it came into the corporation simultaneously with his instructions to pass it to his personal credit, and never rested but for a moment to the credit of the treasury of the corporation."

The payee of the note (Hotchkiss) testified positively that he had no knowledge at the time of the loan that any part of the money was, or was to be, used by Bailey for his own purposes; and we do not think the case contains sufficient evidence to support a finding to the contrary. As an innocent bona fide holder of an authorized note, he could collect it from the company, although the proceeds were used without his knowledge in the manner stated by the learned trial court.

It follows that the judgment and order should be reversed.

Judgment and order reversed, and new trial granted; costs to abide the event.

(97 App. Div. 205.)

In re DONOHUE'S WILL.

(Supreme Court, Appellate Division, Second Department. September 29, 1904.)

1. TESTAMENTARY CAPACITY—EVIDENCE.
    Evidence on proceedings to probate a will and codicil *held* insufficient to sustain a finding of lack of testamentary capacity at the time the codicil was executed.

2. SAME.
    Where, on contest of a will on the ground of testamentary incapacity, the physician of deceased is called, and it is conceded that he was an honest and fair man, the fact that when he was asked as to the question of testator's capacity on the day on which he executed a codicil he hesitated, and spoke after deliberation and thought, ought not to be accepted as evidence of the falsity of his answer that testator was of a sound mind on that date, there being no evidence to the contrary, and the presumption being in favor of testamentary capacity.

Appeal from Surrogate's Court, Kings County.

In the matter of the probate of the last will of George W. Donohue. From an order finding a certain writing not a valid codicil, Marietta L. Donohue and others appeal. Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

Albert B. Boardman, for appellants.
Augustus Van Wyck and George B. Abbott, for respondent.

WOODWARD, J. George W. Donohue died at the age of 52 years, on the 16th day of December, 1902, leaving a last will and testament, with a codicil attached. Proceedings looking to the probate of this will were commenced on the same day by the persons named therein as executors. Objections were filed to the probate of the will and codicil by Patrick J. Madden, one of the heirs at law and next of kin, and to the probate of the codicil by Eliza Stewart, a legatee and devisee under the will. The learned surrogate admitted the will to probate, and overruled the objections to the form of the codicil, but held that the same was void because of lack of testamentary capacity on the part of the testator. There

is no appeal from that portion of the decree which admits the will to probate, and the only question here is whether the objections to the testamentary capacity of the testator are sustained by the evidence. After a careful perusal of the testimony, aided by the opinion of the learned surrogate and the suggestions of counsel, we are unable to reach the conclusion that George W. Donohue was incapable of acting intelligently in the disposition of his property on the date of the codicil, the 18th day of November, 1902. Mr. Donohue's will was made and executed on the 20th day of March, 1902, after he had sustained a light stroke of paralysis. It disposes of a considerable estate, and gives to "Marietta L. Donohue, widow of my late brother, Augustin H. Donohue, the sum of five thousand dollars," making her also one of the executors of his will. After making several personal and charitable bequests, the testator gives the remainder of his estate of every character to Mrs. David S. Stewart, a cousin several degrees removed. Subsequent to the making of this will Mr. Donohue was seriously ill. He resided at the Mansion House, in the borough of Brooklyn, and his sister-in-law, Marietta L. Donohue, in harmony with a promise which she says was exacted by her deceased husband and George W. Donohue's deceased mother, visited him daily, and looked after his needs. Subsequently Mr. Donohue went to the country for his health, and was accompanied by Mrs. Donohue, who resided in the same place, but at a different hotel, and who watched over him during the summer, walking with him, and performing other kindly offices. She testifies without contradiction that she never made any suggestions of any kind in reference to the disposition of his property, and there is nothing suggested in the evidence that she did anything which was not entirely becoming and proper in the sister-in-law of an invalid, who had no wife or family to look after him. Mr. Donohue returned to the Mansion House in September, and his physician testifies that he was much improved in health. While the witnesses do not entirely agree as to his condition, there is a very general consensus of opinion that, although not as active and free in his intercourse with those about him as formerly, he was improved in health over the time of his departure; and this condition appears to have continued during September and October. Dr. McCorkle, who is conceded by all to be a physician of recognized standing and integrity, attended him during his entire illness, and, after detailing his condition during the spring and summer, he says: "I saw him on November 1st, November 5th, and November 9th. He was not feeling so well then: November 9th was the first time I saw any change for the worse. The trouble was with his bowels. He became obstinately constipated." He then says he thought the patient would be easily relieved, but was mistaken, and that he saw him on the "11th, 12th, 13th, 14th, 15th, 16th, 17th, 18th, and then not again until the 20th; then the 25th and 27th. He improved very much after that. The reason why I omitted my visits for a few days after the 18th was that he was so much improved." After detailing the testator's illness during the time that he was troubled with constipation, at which time the

patient became very weak, the same witness continues: "I found a decided improvement, beginning some time prior to the 18th of November, and continuing for a considerable period after that. As to his mental condition during this physical weakness that I have described, the mind was weak with the body, but no weakness of the mind that would not have been explained by the weakness of the body. They both shared equally in the weakness. His mental condition on the 18th was sound. I wonder if there is any way of explaining that. He was physically weak, and his mind shared some degree of the weakness; but at that time—the 18th— he had improved so much physically and mentally that he was something like his old self, but very weak." This same witness, under cross-examination, maintained the same position, except that upon the question of whether the testator was competent on the 18th day of November, 1902, the date of the codicil, the doctor hesitated; and this seems to have been the turning point in the case, for the learned surrogate says:

"Upon that question of whether he was competent or not at the later date— the question which I have got to pass upon—the doctor was in grave doubt. He hesitated, and when he was asked why he said that it was such an important question that he wanted to give it due thought. That is, notwithstanding the natural preparation and reflection which being on the witness stand for the entire afternoon should have given him, when this question was put at the conclusion of the case he again waits, because he wanted to give it due thought."

But he answered it in the affirmative, after giving it due thought, and the learned surrogate tells us that the witness was entirely worthy of credence, yet he relies upon this hesitation on the part of the witness to overcome the presumption which exists in favor of the validity of the codicil, and which had not been overcome by any of the previous witnesses. It seems to us that, the witness being concededly an honest and fair man, the mere fact that he hesitated, and that he spoke only after deliberation and thought, ought not to be accepted as evidence of the falsity of his answer that the testator was of sound disposing mind on the 18th day of November. The witness had been on the stand all of the afternoon. Upon his direct examination he had been most careful to explain that the testator was very ill at a certain time; that he was physically very weak, and that this condition had extended to the mind. If the witness stopped to collect his thoughts, and to determine upon his correct answer, it was not evidence that the testator was not in a condition of mind to enable him to make a codicil to his will, the material effect of which was to drop Mrs. Stewart, his distant cousin, who had not been near him during his illness, as his residuary legatee, and to substitute Mrs. Donohue, widow of his deceased brother, who had watched over him for months. While the courts should see that the testamentary act is freely exercised by the aged, weak, and infirm, without restraint, force, or fraud, so as to promote their own comfort and enjoyment, and should guard and protect them with the greatest care and circumspection from imposition and improper influence, they should hesitate to find that undue influence has been practiced, or that a testator was

of unsound mind, where a will is fair and reasonable, according to the common instincts of mankind, and such as might, with propriety and justice, be made by a decedent. Children's Aid Society v. Loveridge, 70 N. Y. 409. It would be difficult to suggest any failure on the part of this will and codicil to express an entirely proper disposition of the testator's property under the conceded facts of this case. There was, so far as appears, no special reason why the testator's remote cousin should be selected as his residuary legatee in preference to his brother's widow. The latter had been recognized in the will as entitled to his favor, not alone by a specific legacy of $5,000, but by being called upon to act as the executrix of the will; and when we consider the fact that she had cared for him during a period of several months, during which time the cousin had not been near him, there was nothing unnatural about the disposition of the property. It was just such a disposition as a man in his right mind, under the same circumstances, might properly have made. It was such a disposition as the average man might have been expected to make. To discredit this codicil because the testator's physician, an eminently fair-minded and conscientious man, hesitated in answering a question which he might have thought required an explanation such as he gave upon his direct examination, is not justified, as we read the evidence in this case. There was no uncertainty in the doctor's answer. He testified squarely that the testator was in a condition to transact business on the day this codicil was executed. Even if we were to believe—what no one suggests—that the witness testified falsely, the evidence would then fail to meet the requirements of the objector's case, for no other witness testifies that the testator was not of a disposing mind on the date in question, although there is some testimony looking in that direction. It is true that a physician who has rather peculiar views as to the competency of persons familiar with a case to judge of the condition of a patient testified that he had a 15-minute conversation with the testator in October, and that he reached the conclusion that the conversation which the testator indulged in on that occasion showed him to be irrational; but the facts which this witness testified to in relation to this conversation are sufficient to convince us that the testator was fully capable of knowing what he wanted to do at that time, and that his conduct was that of a sick man, who did not care to be troubled about the details of matters connected with his position as a member of the board of education, rather than of one who was irrational. But assuming that the testator was irrational in respect to the matters then under consideration, it does not establish that he was not of disposing mind on the 18th day of November, for it has been held that even insane delusions do not incapacitate a man from making a valid will, unless the will was the result of the delusion. Dobie v. Armstrong, 160 N. Y. 584, 593, 55 N. E. 302. There was no relation whatever between the matters talked over at this October conversation and the provisions of this codicil.

There is no presumption against a will or codicil because made by a man of advanced years, nor can incapacity be inferred from

an enfeebled condition of mind or body. Such a rule would be dangerous in the extreme; and the law wisely sustains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property and the scope, meaning, and effect of the provisions of the will or codicil. Horn v. Pullman, 72 N. Y. 269, 276; Dobie v. Armstrong, supra. The evidence in this case does not go beyond the point of showing that the testator was, at the time of the making of this codicil, in an enfeebled condition of mind and body. The positive evidence of Dr. McCorkle is that the testator was in a condition to understand his own mind and to dispose of his property on the 18th day of November. How, then, can it be said that the evidence in this case overcomes the presumption in favor of this codicil? There is no positive evidence disputing Dr. McCorkle. He is not discredited by anything except by the fact that he hesitated in answering a question, and this is a long way short of establishing affirmatively that a man is or was incapable of disposing of his own property. A change of testamentary intention, as bearing upon the question of undue influence in procuring a will, is sometimes an important circumstance. But its force depends mainly upon its connection with associated facts. If made upon a reason satisfactory to the testator, although it may seem inadequate to a court investigating the question of undue influence, it furnishes of itself no ground for setting aside a will. A testator has a right to dispose of his property in any way he may deem best. He is not required to make an equitable will, and he may, if he choose, exclude his children, or divide his estate among them unequally. The question in all such cases is, was the will the free act of a competent testator? Horn v. Pullman, supra; Dobie v. Armstrong, 160 N. Y. 593, 55 N. E. 302. In the case now before us the presumption in favor of the validity of the will and codicil is supported by positive evidence, and is not met by any positive evidence to the contrary.

We are of opinion that the learned surrogate has misapprehended the effect of the evidence in this case; that the evidence does not tend in any degree to establish the fact that the testator was not of sound disposing mind on the 18th day of November, 1902; and under the rule recognized in Matter of Hunt, 110 N. Y. 278, 18 N. E. 106, and Matter of Rapplee, 66 Hun, 558, 21 N. Y. Supp. 801, affirmed on opinion below 141 N. Y. 553, 36 N. E. 343, we are of opinion that the decree of the surrogate, in so far as it denies probate to the codicil, should be reversed, and the issues directed to be submitted to a jury. All concur.