(75 Misc. Rep. 38.)

## In re SANDBERG'S WILL.

(Surrogate's Court, New York County. December, 1911.)

1. WILLS (§ 61*)—CONTRACTS TO DEVISE OR BEQUEATH—JURISDICTION OF EQUITY.

   Mutual or reciprocal wills may be the result of contracts, oral or written, and, on the death of one party, equity frequently enforces such agreements to prevent gross injustice.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 168; Dec. Dig. § 61.*]

2. WILLS (§§ 53, 164*)—PROBATE—ADMISSIBILITY OF EVIDENCE.

   On a proceeding in Surrogate's Court to probate a will, proof of a prior agreement for the making of mutual or reciprocal wills and its partial performance may be received on the question of the testamentary capacity of testatrix and undue influence exerted upon her.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 111, 112, 120–130; Dec. Dig. §§ 53, 164.*]

3. WILLS (§ 55*)—PROBATE—SUFFICIENCY OF EVIDENCE—CAPACITY OF TESTATOR.

   In probate proceedings, evidence of the capacity of testatrix *held* insufficient to authorize the probate of a will revoking a prior will.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

Proceedings to probate the will of Francine Francoise Sandberg, deceased. Probate denied.

Leon Bleecker and Mr. Silberman, for proponent.
William J. Lippmann, for contestant.

FOWLER, S. The proofs in support of the paper propounded as the last will and testament of Mrs. Sandberg, deceased, were given in by the attesting witnesses to the will. One of them was a stranger to Mrs. Sandberg until the very moment of the attempted execution of the will, while the other was the lawyer who had a moment before drafted the paper propounded. The lawyer was also a stranger to Mrs. Sandberg, who was, on the 25th day of March, 1911 (the date of the inception of the paper propounded), mortally ill and lying in a ward of St. Vincent's Hospital in this city. Who summoned this lawyer to Mrs. Sandberg is not disclosed; he himself could not tell who engaged him for the professional service in question. The lawyer, it appears, picked up the other attesting witness on his way to the hospital. It was in this informal way that the paper propounded came into existence.

The affirmative proofs offered in support of the execution were barely sufficient to put the contestant to the proofs of the matter stated in his formal objections to the probate filed pursuant to the rule of this court. In fact, that indispensable requisite for the execution of a will under the existing statute of wills, rogatio testium, or a request to the attesting witnesses to so act, was barely made out. Had it not been for the presence of a lawyer at the celebration of the alleged act, and the presumptions of regularity which flow from his professional presence, the prima facie proofs would have been barely sufficient to put

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

the contestant to his proofs of his objections. Neither attesting witness could have had any acquaintance with Mrs. Sandberg or knowledge of her mental condition, except that which resulted from a brief and very superficial acquaintance that began and ended on the day of the will. But on their oaths they stated she was competent to make a will, and under no restraint. The value of their opinion on these points is to be determined by the extent of their opportunities to form such an opinion, and their opportunities were not great. It was by such testimony that the contestant was put to his case. The contestant is the husband of the dead woman.

Mrs. Sandberg, the alleged testatrix, was the wife of a small dealer in antiques, who had no home or property other than his store and its contents, known as "The Little French Store," in this city. The store was used as the sleeping place, during periods of good health, and contained a bed behind a screen which shielded the bed from the sight of customers. This constituted their sole home. Mrs. Sandberg, when able, assisted her husband in the store; but when taken seriously ill, she was in February, 1911, perforce removed from the store to the French Hospital, where she could be properly cared for in a more convenient place than the store afforded. Prior to that time the relations between the husband and Mrs. Sandberg were always affectionate and exemplary.

Mr. Sandberg's property consisted of his business, and the contents of his store, which both carried on for a livelihood prior to Mrs. Sandberg's necessary removal and the illness which proved fatal. At Mrs. Sandberg's solicitation it appears that Mr. Sandberg had conveyed to her without any consideration besides her mutual agreement, on the 17th day of December, 1910, a one-half interest in his stock in trade, and by the same instrument he entered into a formal copartnership agreement with her. On the same day, and as part and parcel of the same transaction, I think, and in consideration thereof, Mr. and Mrs. Sandberg executed mutual or reciprocal wills in each other's favor, whereby the survivor acquired all the property of the other spouse. Each appointed the other executor. By this arrangement it would appear that Mr. Sandberg provisionally, at least, protected himself and intended so to protect himself and his business from the intrusion of strangers. The couple had no children, the property of the wife came from the husband, and on Mrs. Sandberg's prior death it was to return to the husband. In the event of his death before her, it was all to be hers. This was the situation in so far as Mr. Sandberg was informed at the time of Mrs. Sandberg's death. After Mrs. Sandberg's death, her part of the mutual or reciprocal will was accordingly probated in common form, before the paper now propounded was filed for probate. If this paper now before me is probated, it revokes the prior will.

[1] Mutual or reciprocal wills may be the result of contracts, oral or written, and, upon the death of one party where such agreements are adequately established, equity frequently enforces them to prevent gross injustice. Edson v. Parsons, 155 N. Y. 555, 556, 50 N. E. 265; Middleworth v. Ordway, 191 N. Y. 404, 84 N. E. 291. To enforce such agreements resort must be had to equity. They cannot be enforced in this court.

[2] Mrs. Sandberg's agreement, its part performance, and the fact of Mrs. Sandberg's execution of the agreement were, however, put in evidence before me. That such evidence was properly received by me on the contested probate under the issues raised I have no doubt. The situation of the testatrix, her declarations and family relations, the nature of her property and her former will, all bore upon the issue as to her mental condition. Rollwagen v. Rollwagen, 63 N. Y. 504; Marx v. McGlynn, 88 N. Y. 357; Matter of Woodward, 167 N. Y. 28, 60 N. E. 233. The circumstances surrounding the execution of a will bear heavily on its validity. If not part of the res gestæ in connection with the execution of the paper propounded, such matters are part of the res gestæ in connection with the acts and conduct involved under the other issues raised by the pleadings.

With the effect of the agreement for mutual wills, and its legal sufficiency, the surrogate has nothing to do in this proceeding. Nor is the question here whether or not Mrs. Sandberg violated her agreement by the attempted revocation, contained in the paper now propounded. Such considerations have no place in this tribunal, and they do not enter into my conclusion. The whole question before the surrogate relates to the validity and sufficiency of the paper propounded and its title to probate. Beyond that I cannot go in this proceeding.

[3] The objections to the paper in question proceed on the usual allegations, want of testamentary capacity in the testatrix and undue influence. The primary question now for my consideration is whether or not at the time of the making of the testamentary paper propounded Mrs. Sandberg possessed testamentary capacity. At this date Mrs. Sandberg was an inmate of St. Vincent's Hospital in this city. She had gone there on the 14th day of March, 1911, as it turned out, to die. Before that, from December 8, 1910, she had been an inmate of the French Hospital, and was ill of a complicated and serious disease. In December, 1910, and during her sojourn there, which extended to March 11, 1911, her condition of mind and body was, to say the least, most grave. Disinterested lay inmates of the same French Hospital have told of her conduct and acts and characterized such conduct and acts while there as irrational, and I believe them. That she was then the victim of delusions as to her great wealth and extended business over all the world is apparent from the testimony of Mrs. Lundgren, a disinterested fellow patient at the French Hospital. That there was ever subsequently any improvement or change in Mrs. Sandberg's condition is not proved, and the presumption is that the condition established continued. Groom v. Thomas, 2 Hagg. 433. But irrespective of this, Dr. Ferrer, the competent physician, who attended Mrs. Sandberg both at the French Hospital and St. Vincent's at the very time the testamentary paper propounded was executed, gave his testimony on the stand, and it was of weight. He states that Mrs. Sandberg was delirious and comatose, and at times under the influence of morphine, and that while at St. Vincent's she was in no condition to attend to business. The attending physician's general opinion on Mrs. Sandberg's mental impairment was unmistakable, although possibly some of the questions

put to him did not comply with the common law governing the opinion evidence of even medical attendants. I shall disregard all the answers of this witness which relate to matters of opinion, except those given in reply to questions not objected to, and I will rely wholly on the facts stated in evidence by this physician, and the answers made by him on his cross-examination. In this way the errors, if any, committed in the reception of his evidence, will be avoided. Evidence upon questions of testamentary capacity is commonly evidence of opinion only. Of the lay witnesses rarely two testify to the same act, and each measures the capacity by some standard of his own. Courts of probate, therefore, do not rely wholly on such evidence, but form their judgment upon the facts and from all the conduct, relations, and acts narrated in the testimony. Evans v. Knight, 1 Add. 239; s. p., Dougherty v. Milliken, 163 N. Y. 527, 533, 57 N. E. 757, 79 Am. St. Rep. 608. I shall next consider the charge that the will was the product of undue influence exerted by or on the part of proponent over a woman of weakened physical and mental condition.

It was proved that while Mrs. Sandberg was at the French Hospital her husband visited her, bringing delicacies to her on "visiting days." The lot of this couple was then, indeed, hard; they kept no clerk, and Mr. Sandberg's extended absence from his store in the business hours meant loss to her and to him. This loss they could, I think, ill afford. If he called at the French Hospital in the evening, the sisters in charge of the hospital "chased him out," in the language of one witness. This action no doubt hospital rules and regulations required, and it is not a subject of criticism. But at times he had to be sent for by the hospital authorities to quiet her when no one else could, and this occurred at night. There is no proof that Mr. Sandberg failed ever to respond. But at other times Mrs. Sandberg was, in consequence of her husband's vocation, unavoidably left much alone, or to the ordinary care of the hospital attendants. Whether from disinterested motives or not I do not know, she was, while at the French Hospital, visited occasionally by a very young man who came to be the sole beneficiary of the paper executed at St. Vincent's Hospital, and now propounded by him to me. Mrs. Sandberg had no extended or intimate acquaintance with this young man. He was the employé of a store carried on by a Mr. Miller, a competitor in business of Mr. Sandberg, and known as the "Louis XIV Store." In these visits this young man avoided Mr. Sandberg. There is some evidence of a declaration by Mrs. Sandberg tending to show that this young man and his sister and a fellow clerk poisoned Mrs. Sandberg's mind by tales of her husband's infidelity. Such declarations may be competent in connection with a charge of undue influence, when such undue influence is established by independent evidence. Cudney v. Cudney, 68 N. Y. 152. I do not think that such independent evidence was produced, and I shall therefore assume that Mrs. Sandberg's declaration to that effect is competent only on the issue of her testamentary capacity.

I am, however, convinced that the interference of this young man in the affairs of Mrs. Sandberg, and his coming between her and her husband at a critical time in their lives, was unfortunate, however well

meant and however disinterested it may have been. The situation of the wife and the husband was too solemn for the covert intervention of strangers. The mental and physical condition of the wife was too grave and unbalanced, and the state of her own and her husband's affairs too unfortunate to warrant such an intrusion without bad results to him. It was a thoughtless even if a well-meant kindness to Mrs. Sandberg, to espouse secretly the fancied grievances of a sick woman, and I am convinced it led to mischievous consequences. Of course, I am concerned with such consequences only in so far as they bear upon the issue of undue influence and the factum of will. Undue influence may be inferred, as it rarely can be proved directly. Matter of Smith, 95 N. Y. 516; Brick v. Brick, 66 N. Y. 149. Certainly the provisions of the paper propounded are so unnatural and so unfair to the husband under the circumstances narrated above as to require explanation on the part of the proponent of this paper now before me. Matter of Budlong, 126 N. Y. 423, 27 N. E. 945. This required explanation has not been given, and without it the will on its face ceases to be a rational disposition for one who had in health been a good wife, her husband's beneficiary, and under contractual and natural obligations to him.

We come next to the consideration of an incident of some importance when all the forces antagonistic to the husband of Mrs. Sandberg seemed to have combined. Mrs. Sandberg was on March 11, 1911, summarily ejected from the French Hospital for nonpayment of her board. Mr. Sandberg, much distressed and unable to leave his shop, applied to his competitor, Mr. Miller of the Louis XIV establishment, for assistance in his extremity. Mr. Miller seems to have delegated the aid sought to the assistants in his shop, one of whom is the proponent of the paper now propounded, and the sole beneficiary and executor named therein. These assistants first took Mrs. Sandberg to a lodging house, and thence to St. Vincent's Hospital. It is apparent that during this charitable ministration, however kindly meant and however proper in itself, much took place which was a mistaken kindness to Mrs. Sandberg and a most reprehensible outrage on the marital custody, authority, and guardianship vested in Mr. Sandberg. That these officious attendants of Mr. Miller's establishment worked on the nervous susceptibilities of Mrs. Sandberg is in evidence, and so much so that Mr. Sandberg is admitted to have said to them that he would go for the police, and "see if a husband has not the right to take care of his wife or do for his wife as he saw fit." But whether he so said or not, these mischievous incidents led, I am satisfied, directly to the will in favor of Mr. Miller's assistant, whose own sister admits on the stand that she said to Mrs. Sandberg during her illness that Mr. Sandberg was "not nice to his wife." The proponent himself admits that he avoided meeting Mr. Sandberg on his visits to the hospital. These circumstances are significant. But there is no direct proof that the will itself emanated from any such wrong influences. The will propounded stands apparently separate and alone, the product of a strange lawyer and his witness picked up on the way to the hospital. It is possible that the hiatus between the facts stated and the ceremony of execution is accidental. I shall assume that it is so, and therefore rely

solely on Mrs. Sandberg's want of testamentary capacity and the lack of circumspection evident in the execution of a testamentary paper in favor of a stranger, at a time when Mrs. Sandberg, the testatrix, was dangerously ill in a public hospital and away from her natural guardian, and without his knowledge. That it was without his knowledge is significant only in so far as it lends color to the accusation that the will was clandestine.

Under the peculiar circumstances attending the execution of the paper propounded, the burden of proving that it was the voluntary and the conscious act of the testatrix lies on him who propounds it as a will. This degree of proof should be high in the situation proved to exist in this cause. The circumstances of Mrs. Sandberg and the facts attending the execution of the paper are quite sufficient to excite the suspicion of the surrogate and to require strict proof on the part of the proponent that the paper propounded as the will of Mrs. Sandberg was the free, the deliberate, and the conscious act of a capable testatrix. The circumstances shown repel the ordinary presumption in favor of a will, and require of the proponent stricter proof not only of the proper execution of the paper propounded, but of all the other elements entering into factum of a will. These requirements are not empty phrases, but substantive doctrines of probate law, and I shall not hesitate to enforce them when occasion requires, although I am ever reluctant to refuse effect to that which is clearly, or even presumptively, the will of the dead.

I am satisfied that the paper propounded is not the will of a capable testatrix, and that proper circumspection on the part of the actors in this particular act of testamentation was wholly lacking. The paper propounded was not the will of Mrs. Sandberg. I have unusual satisfaction in arriving at this conclusion in a case which to my mind bears so many marks of injustice, utter lack of circumspection, and even impropriety.

Settle decree accordingly, reserving questions of costs until settlement.

Decreed accordingly.