## In re CAMPBELL'S WILL.

(Surrogate's Court, New York County. March 2, 1912.)

1. WILLS (§ 155*)—UNDUE INFLUENCE—NATURE.

Undue influence inducing the making of a will must, to invalidate the testamentary act, be associated with some element of wrongful conduct and fraud on the part of persons receiving a benefit from the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. WILLS (§ 55*)—TESTAMENTARY CAPACITY—WEIGHT OF EVIDENCE.

Evidence in a will contest *held* not to establish testamentary incapacity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

3. WILLS (§ 50*) — TESTAMENTARY CAPACITY — "NATURAL OBJECTS OF HIS BOUNTY."

If a person has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who would or should or might be the objects of his bounty, and the scope and power of the provisions of his will, he has testamentary capacity; the term "natural objects of his bounty" does not mean that he should know and recognize every distant relative who is entitled to inherit from· him under the existing canons of descent, and does not include cousins to the second and remoter degrees of propinquity, but refers to his near relatives.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 96–100; Dec. Dig. § 50.*]

4. WILLS (§ 53*) — TESTAMENTARY CAPACITY — EVIDENCE — TRANSACTION OF BUSINESS.

The fact that a testator supervises his own large estate wisely and prudently until his death is evidence, on the issue of testamentary capacity, that he understood the condition of his property.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 111, 112, 120–130; Dec. Dig. § 53.*]

5. WILLS (§ 50*)—TESTAMENTARY CAPACITY—DEGREE OF MEMORY.

Though a man may have lapses of memory and show childishness at times, yet, if he can manage his affairs prudently and show a due appreciation of the nature and amount of his property and of the claims of near and dear relations, his testamentary capacity is sufficient.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 96–100; Dec. Dig. § 50.*]

6. WILLS (§ 31*)—TESTAMENTARY CAPACITY—DEGREE OF MENTAL CAPACITY.

Feebleness of intellect will not invalidate a will. One may not have sufficient strength of memory and vigor of intellect to make and digest all parts of a contract and yet be competent to· make a will; the capacity required by law for making a will being much inferior to that required by equity in the enforcement of executory contracts.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 66–68; Dec. Dig. § 31.*]

7. WILLS (§ 38*)—TESTAMENTARY CAPACITY—PARTIAL INSANITY.

A testator may be peculiar and even insane upon some special topic, and yet have sufficient capacity to make a will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 78–81; Dec. Dig. § 38.*]

8. WILLS (§ 52*)—TESTAMENTARY CAPACITY—PRESUMPTIONS—ADVANCED AGE.

There is no presumption of testamentary incapacity by reason of advanced age.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

9. EVIDENCE (§ 501*) — OPINION EVIDENCE — CONCLUSIONS AND INFERENCES FROM FACTS.

Nonexpert witnesses may not give their direct opinion concerning the sanity or insanity of a testator, but are confined to facts such as the conversation and the observed conduct of testator, and may then be permitted to state whether in their opinion such conduct and conversation was or was not rational, thereby enabling the court to see for itself how well founded such opinions are and to reject those that are ill founded.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2292–2305; Dec. Dig. § 501.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

10. WILLS (§ 38*)—TESTAMENTARY CAPACITY—DELUSIONS.

Delusions are issuable facts on the issue of testamentary capacity, and the evidence of such ·delusions depends upon the truth of the declarations of the alleged deluded person.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 78–81; Dec. Dig. § 38.*]

11. WILLS (§ 54*) — TESTAMENTARY CAPACITY — EVIDENCE — DECLARATIONS OF TESTATOR.

Written or spoken declarations of testator are competent evidence, on the issue of testamentary capacity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 131–134, 136; Dec. Dig. § 54.*]

12. WILLS (§ 55*)—TESTAMENTARY CAPACITY—DELUSIONS.

Declarations of testatrix, who had survived all her immediate family of brothers and sisters, to whom she had been much attached, and who was herself aged, with no relatives nearer than first cousins, and who lived with servants in a large mansion, but who conducted her household and ordinary property affairs intelligently, to the effect that her sister K. was in the next room, or upstairs, when K. was in fact dead, not shown to have any connection with the will, did not establish testamentary incapacity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

13. WILLS (§ 38*)—DELUSIONS—EFFECT ON WILL.

Delusions subsisting along with rationality on every other subject, unless they entered into ·the substance of the will, do not per se establish testamentary incapacity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 78–81; Dec. Dig. § 38.*]

14. WILLS (§ 166*)—UNDUE INFLUENCE AND FRAUD—BURDEN OF PROOF—DEVISE TO PERSON DRAWING WILL.

That an attorney who was the legal adviser and family friend of testatrix wrote into the will a provision for his mother, a first cousin of testatrix and presumptively an heir at law and 'one of the next of kin, his own hope of ultimate benefit being remote, did not of itself establish a charge of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

15. WILLS (§ 163*)—PROBATE—BURDEN OF PROOF.

The burden of proof is upon the person propounding a will, and he must satisfy the court that the instrument is the last will of a free and capable testator; and the fact that the draftsman takes a benefit under the will only raises a suspicion which must be removed, before the court will pronounce for the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

16. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

Evidence in a will contest *held* not to establish undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

17. WILLS (§ 163*)—UNDUE INFLUENCE—PRESUMPTION.

The mere fact that testatrix provided for first cousins, and in one instance for a second cousin, but omitted certain second and third cousins, created no presumption against the will, especially where the property devised had not come from their common stock of descent.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

18. WILLS (§ 155*)—UNDUE INFLUENCE—IMPORTUNITY.

It is not necessary that the making of a will should originate with a testator, or that no solicitation to that end should be made.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

19. WILLS (§ 277*)—PROBATE—PLEADING IN ACTION TO CONTEST WILL.

Undue influence is not such a species of fraud as to be always provable under a bare allegation of fraud on the contest of a will on that ground, but must be separately alleged.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 632–635; Dec. Dig. § 277.*]

20. WILLS (§ 286*)—PLEADING IN ACTION TO CONTEST WILL—ISSUES AND PROOF.

A charge of undue influence is inconsistent with a charge of non compos mentis, but under a charge of undue influence contestants may show feebleness as an element of coercion.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 647–650; Dec. Dig. § 286.*]

21. WILLS (§ 155*)—VALIDITY—"UNDUE INFLUENCE."

"Undue influence" is a species of fraud, and in probate law is an unlawful coercion which destroys the free agency of a testator, and substitutes for his free and disposing mind some will other than his own.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172; vol. 8, pp. 7823–7824.]

22. WILLS (§ 166*)—CONTESTS—SUFFICIENCY OF EVIDENCE—UNDUE INFLUENCE.

Undue influence alleged by contestants against the probate of a will need not be established by direct evidence, but may be established by circumstantial evidence; the proof must establish conduct inconsistent with fair dealing and good conscience, and the influence proven must amount to a legal wrong against testator or some one who would otherwise be the natural object of his bounty; a mere opportunity to exercise undue influence, the existence of confidential relations, and fair solicitation by a legatee or executor, are insufficient in themselves to establish undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

23. WILLS (§ 164*)—UNDUE INFLUENCE—ADMISSIBILITY OF EVIDENCE.

A change of testamentary intention is admissible upon the issue of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

24. WILLS (§ 487*)—PAROL EVIDENCE TO VARY WRITING.

Under the general principle that no extrinsic evidence, however conclusive in its nature, can be admitted with a view of setting up an intention inconsistent with a writing, oral proof to vary or explain wills is inadmissible, except there be an equivocation.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1023, 1026–1032; Dec. Dig. § 487.*]

25. WILLS (§ 165*) — VALIDITY — UNDUE INFLUENCE — ADMISSIBILITY OF EVIDENCE.

Where parol evidence of a testator's intention to die intestate is considered on the issue of undue influence, it is only in case of a great change of testamentary intention long adhered to and evidenced by a sudden change that such change demands explanation where the person in whose favor the change is made possesses great influence and originates the

whole transaction; but the mere passive conduct of being intestate is not sufficient to require such explanation.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 415–420; Dec. Dig. § 165.*]

26. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

Evidence in a will contest *held* not to establish the testatrix's long-continued intention to die intestate, as bearing on the contention that a sudden change of testamentary intent indicated the presence of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

27. WILLS (§ 155*)—UNDUE INFLUENCE—IMPORTUNITY OR PERSUASION.

Where the sister-in-law of testatrix, who was seised of real property held in common with testatrix, desired her to make a will, so as to avoid the effects of intestacy, and testatrix was advised by eminent conveyancers to make a will in order to save her cotenant the necessity of a partition of property of great value, the request of the cotenant, not otherwise benefited by the will, that testatrix make a will, did not constitute undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

28. WITNESSES (§§ 140, 202*)—COMPETENCY—TRANSACTION WITH DECEDENT—CONFIDENTIAL COMMUNICATIONS.

A devise to the person who had drafted a will of the right of nomination to the beds endowed in various hospitals by testatrix was not a bequest of such a beneficial interest as to exclude the devisee from testifying on a contest of the will, either under Code Civ. Proc. § 829, providing that a party interested shall not be examined as a witness in his own behalf against a person deriving a title or interest from a deceased person, or concerning a personal transaction between the witness and the deceased person, or under section 835, declaring that an attorney may not disclose a communication made by his client to him, or his advice thereon in the course of professional employment.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 598–618, 756, 757; Dec. Dig. §§ 140, 202.*]

In the matter of the probate of a paper propounded as the last will and testament of Maria L. Campbell, deceased. Decree admitting will to probate.

De Witt, Lockman & De Witt (John Vernon Bouvier, Jr., of counsel), for proponent.

Osborne, Lamb & Garvan (James W. Osborne, of counsel), for contestant.

Einar Chrystie, for Justine Van Rensselaer Townsend, Harriet Van Rensselaer Crosby, Eugene Van Rensselaer, Walter Van Rensselaer Berry, and Nathalie Boynton; Andrew S. Hamersley, special guardian.

FOWLER, S. The issues in this cause, introduced with much solemnity by reason of the greatness of the estate, present no real difficulty either of law or of fact. They are those very common in this court: Want of testamentary capacity of the testatrix and undue influence exerted over her by or in the interest of the beneficiaries of the will. The want of testamentary capacity here claimed is, however, of a subtle kind, and on the final argument it was not much pressed (for I

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

asked that question), except in conjunction with the charge of undue influence. The undue influence relied on by contestants presents this anomaly or singularity, that not one of the beneficiaries under the propounded script is charged with any connection with it, or even to have benefited by it to any appreciable extent. The persons really charged by contestants with the scheme of testamentary fraud—for, disguise it as we may, an allegation of undue influence is an allegation tantamount to a charge of fraud in its subtler aspects (Kinne v. Johnson, 60 Barb. 69; Matter of Will of Smith, 95 N. Y. 516)—are completely disassociated from those who take under the paper propounded. This is a singular feature of this cause, but it is not more singular than the contestants' alternate disavowals of fraudulent conduct or interest on the part of those charged with the scheme of undue influence and contestants' insistence on the result of the acts charged. The contestants cannot in this particular delegate to the surrogate a burden they themselves are unwilling to assume.

[1] Either the will offered in this cause was the product of a scheme of deliberate fraud and baseness, exerted over a helpless and feeble testatrix, or it was her valid testamentary act. I at least must, at the outset, assume that the contestants' charges are deliberaely made, with full knowledge of their gravity and consequences, if I am expected to apply correctly the rules of law applicable in this court to such serious allegations. There is no such thing in law as dolus bonus or fraud which contains no element of wrongdoing. In the Roman law there was no such thing as theft of land, yet if a person removed the landmarks, and thus appropriated it by inches, he was guilty of an analogous offense. So in our law, undue influence, while not a crime, is an offense against law and morality, or it would not be redressed in courts of justice. If I find undue influence in this matter, then the persons charged with exerting it must be convicted by established rules of law, and not on evidence or assertions and relations entirely consistent with good faith and fair dealing. In respect of any kind of fraud there is no via media, and I cannot accept the disclaimers of contestants of moral delinquency on the part of proponent, if I am expected to find against the will and those most concerned in its production.

Maria L. Campbell, whose formal testamentary intentions are the subject of this proceeding, died in this county in the year 1911 possessed of a very large personal estate and seised of considerable real property of much less value. Miss Campbell was the aged survivor of a family of brothers and sisters who had either died childless or unmarried. She was the last of her immediate race. The brothers and the sisters, while unmarried, all lived together in this city until successive deaths finally left the testatrix alone in her residence, 177 Fifth avenue, where the family had removed from the still older residential parts of the town. The family life of testatrix was marked by a simplicity, seclusion, and dignity characteristic of the old-fashioned world to which the testatrix obviously belonged, and which is not without its legal significance. By successive inheritances and saving habits Miss Campbell had become in her lifetime a very rich woman. The history of the original inheritance illustrates to some extent how completely the tes-

tatrix was freed from the natural claims of those the law termed her kindred, and how completely she was at liberty to do what she willed with her own. At the time of her death the nearest relations of testatrix were the first cousins mentioned in the will.

The contestants and the proponents in this cause were all related to testatrix through her mother, who was of the family of Bayard. But the great fortune of the testatrix was derived not from her mother, but through her father, Duncan Pearsall Campbell, from his mother, who was an heiress, of the family of Pearsall. It is curious that not one of the contestants or one of the beneficiaries under testatrix's will had a drop of Pearsall blood in their veins. The estate of testatrix had been also augmented by an inheritance from her deceased brother, who had in turn inherited it from his wife, a Miss Sanderson, an English lady of fortune, and the fortune of this lady ultimately had passed to testatrix. None of the contestants or the beneficiaries was related to the Sanderson lady in question. While the sources of fortune held in full property and dominion have a legal bearing only in cases of intestacy, when the law leans to the ancient maxim, "Paterna paternis, materna maternis," in some instances, yet the facts just denoted place some emphasis on the moral, as well as the legal, right of testatrix to do what she liked with her estate, irrespective of her maternal kindred, the Bayards, and their descendants and branches. Matter of Cornell, 43 App. Div. at page 244, 60 N. Y. Supp. 53. The testatrix left no surviving kindred of the Pearsall or English stocks indicated, whose moral rights in abstracto to expectations of inheritance from testatrix might have been better founded than any presented in this cause. The bare legal rights of contestants to share in the real estate in the event of intestacy are, however, on the other hand, clear. They can in no event assert rights in the personal estate of the deceased.

In her well-regulated and long life it appears that the testatrix had been most intimate with the immediate family of her maternal aunt, Mrs. Stephen Van Rensselaer, of Albany, who was her mother's sister. It is this aunt's children who are the principal beneficiaries under the will propounded. Mrs. Townsend, the daughter of Mrs. Stephen Van Rensselaer, had in the youthful days of testatrix passed a whole winter while at school in New York with her aunt, Mrs. Campbell, the mother of testatrix. Thus testatrix and her cousin, Mrs. Townsend, had grown up together. After the brothers and sisters of testatrix had passed away, the surrogate is able to perceive no more natural object of testatrix's bounty than her first cousin, Mrs. Townsend, and Mrs. Townsend's surviving brother and her sisters, Mrs. Berry and Mrs. Crosby, who were contemporaries of testatrix and her first cousins. It was at their father's manor house in Albany that the maternal grandmother of testatrix, Mrs. Bayard, had lived and died. There is no doubt from the record that the testatrix and the immediate survivors of the family of General Stephen Van Rensselaer were, at the time of the will, not only the most closely related to testatrix, but on the most intimate terms of all the parties to this proceeding. It is apparent that even those survivors of Gen. Van Rensselaer's family who lived at a distance from testatrix were never forgotten by testatrix in

her lifetime. It was this particular branch of testatrix's maternal relations whom she knew best personally and that by law would take all her large personal estate under the statute of distributions of this state. The rules regulating descent of real property would also include them, but in addition let in the contestants who otherwise would not be entitled to share at all in the estate of the deceased. Not one of the contestants, it is to be observed, has in any event a legal title to share in the large personal estate of Miss Campbell, even if her will be set aside. Their respective shares in her real property would, however, then attach to some not large aggregate. Thus the gist of this contest relates solely to the devises.

The contestants are all in degree more distantly related to testatrix than are Mrs. Townsend, Mrs. Crosby, and Mr. Eugene Van Rensselaer, the principal beneficiaries of the will. The legal right of such contestants to share by descent to some extent in the real property of Miss Campbell in the event of her intestacy is, however, clear. The canons of descent are more liberal than the statute of distributions to the remoter kindred of an intestate. But although the relationship of contestants may be only a degree more distant, it is apparent to me from the testimony that their intercourse with the testatrix during her lifetime was also less intimate in degree than was the intimacy of testatrix with her cousins of the Gen. Van Rensselaer branch of her maternal connections. This is a material fact. But as the right of the more distant cousins to share in the inheritance of testatrix is fixed by law, such right is to be respected by this court. But the courts sometimes deny in effect that, for the application of rules of law, distant cousins stand to the fullest extent among those who are in law termed the "natural objects of a testator's bounty."

In Matter of McCarty, 141 App. Div. 816, 820, 126 N. Y. Supp. 699, 702, the Appellate Division of the Supreme Court very recently said that such natural objects of a testator's bounty as second and third cousins "have something of the character of a dissolving view; at least, they are not as formidable in fact as they appear in rhetoric, and we are of the opinion that a person of sound and disposing mind might absolutely close his eyes and his mind to the existence of his cousins and grant his entire estate to intimate business and social associates without giving rise to the presumption of having been defrauded by undue influence in the disposition of his property." This is the weighty and recent utterance of a great court of this commonwealth. But, as I have stated, the locus standi of contestants to dispute the will is complete in this matter. The justice of their invocation of maxims, which are applicable to testators who disinherit those "natural objects of their bounty" who have been dependent on testators in the lifetime of both, is another and weightier consideration. I doubt, for example, if remote cousins have the same standing to invoke the rigid maxims which are applicable in probate causes in the instance of such close relationship as father and son. What would be unjust to a son might not be unjust to a third cousin. I am not sure that what would be a fraud or wrong towards a son in respect to a father's inheritance would be in law a fraud or a wrong

toward a third cousin to a testator. But be this as it may, the contestants in this cause shall have the benefit of all presumptions favorable to the heir at law in probate cases. To more than that consideration they can have no title.

At the outset of this cause there was a disposition apparent in connection with the charge of undue influence to regard the rights of the contestants as heirs presumptive of Miss Campbell as being fixed, even during her lifetime. Thus, gifts made by testatrix to her own brother and heir presumptive during their joint lives were invoked as some evidence of fraud by the donee upon the second and third cousins of testatrix, or else as furnishing the motive of one of the persons charged with the exercise of undue influence over testatrix. But on the final argument of this cause I am happy to say that I detect no reference to this irrelevant claim. In any event, I can hardly think it very material to the charge of undue influence. It would add a new terror to the death of the possessor of a great fortune if every gift of such childless possessor during his whole life was to be made subject to the tacit approval of those who might by any possibility ultimately be entitled to share in his inheritance as heirs general. Such a pretense as that stated being either out of this case or subordinated to the charges of want of capacity and undue influence exerted from other motives, we may pass on to the next consideration in order.

[2] Having referred generally to the situation of the testatrix in respect of her property and kindred, I shall next proceed to consider the effect of such of the testimony as bears upon the allegations of want of testamentary capacity of testatrix and the undue influence charged to have been exerted over her. When testatrix in 1908 came to make the will offered for probate, she was in or about the seventy-seventh year of her age. She was then the sole survivor of her immediate family and lived alone in the family residence in this city. That she mourned deeply, and with the tenderest affection, the departed sisters and brothers who had preceded her to the tomb, is apparent at every stage of the evidence. The last sister of testatrix, Catherine, the "Kitty" of the evidence, died July 2, 1904, and the last brother, Thomas Pearsall Campbell, died November 26, 1906.

The will of testatrix was executed October 21, 1908. Her's had been a life of singularly dignified seclusion. Its activities had all centered either in her immediate family or in her favorite charities, in which she had always exhibited a generous and, I may add, an intelligent, interest. On the whole, Miss Campbell's life had been an elevated and exemplary life, devoted in an unusual degree to the narrowing circle at home. As to each of the brothers and sisters departed, there had been on the part of testatrix an unusual tenderness in life, so it ended after their deaths in an intense and pathetic sorrow, now permitted to figure in the charge of mental unbalance, although perhaps consistent with mere morbidity and a peculiar sense of isolation on the part of testatrix.

Towards the latter end of her life testatrix had several severe falls, characteristic of old people, and she was much confined to her house; but with the exception of accidents her general health, mental

and physical, seems to have been that common in the old age of normal and well-regulated people. The adminicular proofs on the part of the proponent were very precise on this point. The Rev. Mr. Bottome, curate of Grace Church, which testatrix attended, gave evidence covering the period of testamentation and down to the death of testatrix, and this evidence was important as showing during all that time that the conversations and conduct of testatrix were rational. The deaconess in charge of one of the charitable foundations established by testatrix was a frequent visitor on testatrix, and her intelligent and neutral evidence covers the year 1908, when the will was made, and on her oath this witness states that the conversation and acts of testatrix were then rational. Dr. Johnson, the surgeon who attended testatrix in 1905, testified to like effect, as did his wife, who had been in attendance as professional nurse to testatrix in 1905. Mrs. Johnson's acquaintance with testatrix continued after 1905, and her evidence bearing on the mental condition of the testatrix in the year 1908 bears strong witness to the entire sanity of the testatrix, almost at the moment of testamentation. The general evidence as to the condition of testatrix before and after 1908 is only important as bearing on the charge of a progressive impairment of a testamentary power. If the contestants' allegation had been that the impairment was acute, the evidence might have been restricted to conditions in the year 1908. The Rev. James P. Fancon, of St. Mark's Church in the Bowery, gives evidence bearing on Miss Campbell's sanity in the years 1910 and 1911, although it was slightly qualified by some trifling hearsay evidence, taken without objection. No other of the witnesses was in a position to give better evidence than was Mrs. Johnson, who was entirely disinterested and highly qualified to speak on the subject of Miss Campbell, her ways, speech, and action at the critical period in this cause.

The documentary and other evidence on the part of the proponents is most convincing, and conclusively shows that the testatrix had a rather unusually correct business method of conducting her expenditures, which continued almost down to the moment of her death. Her checkbooks, in her own clear handwriting, were models of neatness and accuracy. I noticed that she even accented accurately a French word. Both testatrix and her sister had, however, a habit of keeping dividend checks for a long period, or until a visit to the bank, at some convenient date, reduced the sums into possession. As the testatrix was a very rich woman, of few wants and relatively small expenditures, and as the companies whose checks were thus accumulated were strong and solvent corporations, I cannot say that this belated habit bears much evidence of insanity. I cannot, from a collection of unrelated eccentricities or solitary habits, infer testamentary incapacity, in the face of overwhelming counter evidence. The documentary evidence of testatrix's own construction is a very powerful index of her mental condition in and about the time when she is alleged by contestants to have been incompetent to testamentate. These bear evidence of her thoughtful care of her servants and of her evident attention to details of expenditure throughout all her later

life. Not one indicates want of testamentary mind in the year 1908. Her simple, charming letters in evidence all speak for the well-ordered mind of testatrix almost down to April, 1908. But I need not recapitulate in detail all the evidence, or allude to the portions which struck me as most cogent on the issue of insanity. If I give the fullest weight possible to all the testimony on the part of contestants, I cannot then make it weigh enough to amount to testamentary incapacity. That Miss Campbell in 1908 was old, very sad, and physically weary is all that I can make out of the evidence. Taking all of the contestants' evidence into consideration, I cannot make out a want of sufficient testamentary capacity under the law of this state.

The law of the land is wisely indulgent to the proper exercise of the testamentary power. All persons, except idiots, persons of un-sound mind, and infants, may, in this state, make a will. Sections 10, 15, Decedent Estate Law (Consol. Laws 1909, c. 13). Testamentary capacity in the abstract doubtless involves profound problems of psychology and psychiatry, or that science which involves the psychical phenomena of the brain. In the hands of some experts such subjects are apt to degenerate into refinements. In the concrete application of the truer tests of testamentary capacity, courts of justice have been compelled to formulate for themselves certain rules which are at this day practical aids in the administration of justice and the result of accumulated experience in everyday matters. A close study of this subject must convince us all that any departure from the rules thus laid down would be as unwise as it is unauthorized. It would be a bold and proud judge who would venture to substitute his own conception on this subject for such deliberate and weighty rules. In courts of justice there is little room for pride of individual opinion. But while in courts of probate there is a greater liberality than in other courts on questions of mental responsibility, so, no doubt, a will may be defeated in a probate cause by reason of the existence of mental states which would not be regarded as insanity in some other tribunals. The doctrines of this court are very well established by authoritative precedents.

[3, 4] If a person have sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who would or should or might have been the objects of his bounty, and the scope or bearing of the provisions of his will, he has testamentary capacity. Delafield v. Parrish, 25 N. Y. 9, 109; Kinne v. Johnson, 60 Barb. at pages 72, 73; Watson v. Donnelly, 28 Barb. at page 655; Roche v. Nason, 105 App. Div. 256, 93 N. Y. Supp. 565, affirmed 185 N. Y. 128, 77 N. E. 1007; Matter of Johnson, 60 Misc. Rep. at page 279, 113 N. Y. Supp. 283. The fact that a testator supervises his own large estate wisely, benevolently, and prudently until his death is evidence that he understands the condition of his property within the definition just cited. Testator's perception of his relation to the persons who should be objects of his bounty does not within such definition, mean that he should know and recognize every distant relative who is entitled to inherit from him under the existing canons of descent. If that were the test of a capacity to devise, the ablest

lawyer in this state might be incapable, for there are some problems as yet undetermined. The definition refers to near relations of a testator, those who are the "natural objects of his bounty." Cousins to the second, third, and fourth degree of propinquity are not included in the definition of "natural objects of testator's bounty." Matter of McCarty, 141 App. Div. 816, 820, 126 N. Y. Supp. 699, 702.

[5] The effect of mental disorder upon the faculty of capacity of the afflicted to make a will having so long been the subject of the most careful judicial consideration, the rules on the subject must be regarded as settled. Thus it is that in courts of probate, though a man may have lapses of memory and show childishness at times, if he can manage his affairs prudently and correctly, show a due appreciation of the nature and amount of his property and of the claims of *near* and *dear* relations, his testamentary capacity is sufficient. Kinleside v. Harrison, 2 Phill. 449; Loder v. Whelpley, 111 N. Y. at page 250, 18 N. E. 874; Haughian v. Coulan, 86 App. Div. 290, 83 N. Y. Supp. 830.

[6, 7] Feebleness of intellect will not invalidate a will. Newhouse v. Godwin, 17 Barb. 256. A testator may be peculiar, even insane, upon some special topic, and yet have sufficient capacity to make a will. Calligan v. Haskell, 143 App. Div. 574, 128 N. Y. Supp. 293. A man may not have sufficient strength of memory and vigor of intellect to make and digest all parts of a contract, and yet be competent to make a will. Stevens and Wife v. Vancleve, 4 Wash. C. C. 262, Fed. Cas. No. 13,412; Harrison v. Rowan, 3 Wash. C. C. 580, Fed. Cas. No. 6,141. Such are the wise rules prescribed for testamentary capacity in this court. It is thus apparent that the capacity required by law for an act of testamentation is much inferior to that required by equity in the enforcement of executory obligations of a contractual kind. But it is unnecessary to refer in the abstract to such general principles of testamentary law.

[8] It is established that there is no presumption of testamentary incapacity by reason of advanced years (Van Alst v. Hunter, 5 Johns. Ch. 148, 158; Horn v. Pullman, 72 N. Y. 269), but there is no categorical definition of insanity of universal application. Each case must always depend on its own peculiar circumstances. Mudway v. Croft, 3 Curt. 671.

[9] In this cause I am bound to pay some attention to the testimony on the part of the contestants regarding the delusions of Miss Campbell, for the testimony comes from a respectable, even if interested, source. The evidence consists, in the main, of certain declarations of Miss Campbell regarding the earthly presence of a dearly loved sister who had, after a long life led in common, predeceased testatrix. The courts of justice of this state have, as it seems to me, with great wisdom, precluded lay witnesses from giving their direct opinion concerning the sanity or insanity of persons whose competency is the subject of judicial investigation. They confine such witnesses to facts, such as the conversation and the conduct which they have observed in the testator, and then permit the witness to state whether in their opinion such conduct and conversation of a testator were or were not

rational. Clapp v. Fullerton, 34 N. Y. 190, 90 Am. Dec. 681; People
v. Spencer, 179 N. Y. 412, 72 N. E. 461; People v. Pekarz, 185 N.
Y. 481, 78 N. E. 294; Matter of Myer, 184 N. Y. 60, 76 N. E. 920,
6 Ann. Cas. 26; People v. Hill, 195 N. Y. 16, 87 N. E. 813. As lay
witnesses rarely have any fixed or accurate standard of mental sane-
ness (Evans v. Knight, 1 Add. 239; Dougherty v. Milliken, 163 N.
Y. 527, 533, 57 N. E. 757, 79 Am. St. Rep. 608), this wise rule of
our highest court permits the trial judge to see for himself how well
founded are the opinions of lay witnesses on this recondite subject,
and thus the court may reject the opinions when they are ill founded
(Will of Sandberg, 75 Misc. Rep. 38, 134 N. Y. Supp. 869; Kinleside
v. Harrison, 1 Ecc. Rep. 304).

[10] Delusions, although generally proved in this court by declara-
tions of deceased persons, are issuable facts regarded as relevant
to the main issue, and therefore they stand on a footing, perhaps, in-
dependent of the rules governing ordinary declarations of deceased
testators; but the evidence of the delusions depends nevertheless on
the truth of the declarations of the deluded.

[11] I shall for a moment consider the general value of the evi-
dence of insanity in probate causes. The declarations written or
spoken of deceased persons whose sanity is the subject of judicial
investigation are always competent evidence, not of the truth of the
statement involved, but to enable the court to reconstruct, as it were,
for himself the mind of the declarant and thus subject it to tests
determinative of testamentary capacity. This is the same process
pursued in other scientific investigations where inductive or deduc-
tive processes are involved. The difficulty lies with the character of
the proof. It is evident to me that spoken declarations of the kind
mentioned are less trustworthy than written declarations, if for no
reason other than that they are nearly always converted into the
speech of the witness. We rarely get the exact words of the dead,
unless written by them. All students of language are familiar with
the difficulty of even transposing any speech from the direct to the
indirect discourse (oratio recta to the oratio obliqua). All logicians
tell us of the ambiguities in words or terms—a change of a word may
alter the entire meaning of the declaration. If we add to these known
difficulties the invasion of the peculiar tricks of speech common to
most translators in the course of translation of any kind, we have
as a result of the process of transposition alone often a very different
product from that of the declarant's own words. The same thing is
true of proofs of spoken admissions, which at times, therefore, are
regarded as small evidence. Again, courts must weigh the interest,
the imagination, the desire, and the bias of the witness to such declara-
tions. The best witness in repeating a declaration may unintention-
ally pervert the sense of the original declaration. An uneducated man,
for instance, who would give evidence of the declarations of a scien-
tist on an abstruse subject, would, with the best intentions, be apt to
misrepresent the speaker whose language he converted to his own.

[12] Can we not apply these considerations to the declarations of
Miss Campbell given in evidence, to the effect "that" her sister "Kitty

was in the next room" or "upstairs," when Kitty was in fact dead? Is it not possible that Miss Campbell perhaps added, faintly or to herself, silently and subconsciously, to such speech the words "to me"— meaning that her sister Kitty was always with her as she had been all her life, by night and by day? How natural such a thought would then be to a lonely old woman in a great dwelling, void of the object of her dearest affection. Who of us when in the vacant mansions of the departed are not almost conscious of their presence, especially if the presence be greatly desired? Yet this is not a delusion of consequence.

I will, however, assume that the declarations of Miss Campbell were just as testified to by the highly respectable witnesses called for the contestants. But even then, when measured by legal tests, do such delusions prove the testamentary incapacity of Miss Campbell? The surrogate thinks not. Here, by the evidence, is a testatrix who conducts her own household and ordinary property affairs intelligently through a long and respectable life; who avoided all complications; a lady dignified and considerate to her servants and always just and faithful to them; devoted to her family; affectionate to her friends; a woman religious, charitable, destitute of all false pride, kindly and true in all the walks of life—is such a person to be declared incompetent in this court under the rules of law here applicable because she may entertain a delusion in regard to a departed sister's continual presence to her, when such delusion has no connection with her will? This is the legal question before me. There are some delusions of an immaterial character in law.

[13] In courts of probate the question is (and this is most important), not whether the testatrix was sane in every particular, but whether she had sufficient competency for the testamentary act in question. It is to this point that the authorities in this court go and to no other. If testator's delusions subsist along with testator's rationality on every other subject, unless such delusions enter into the substance or fabric and context of the will itself, they do not per se establish the testamentary incapacity of the deluded testator. In Banks v. Goodfellow, infra, Lord Cockburn said even of a delusion which enters into the will itself:

"If it refer only to a single relative, the rest of them being properly remembered, I think we should hesitate to break the will for that reason alone."

· It will be remarked in this cause before the surrogate that not a single alleged delusion had anything at all to do with the will of Miss Campbell. So liberal is the law of this court in respect to testamentary capacity that it is sometimes doubted, where a man wills his property to his heirs at law, whether mania per se or the insanity of the testator in the abstract has any relevancy to such an act of testamentation. But be this as it may, and I express no opinion on it, the effect of irrelevant or partial delusions of an otherwise sane testator is now well settled in this court. If the will is not the offspring of the delusion, the delusion per se will not avoid the will. Dobie v. Armstrong, infra.

The doctrines of courts of probate relative to the effect of partial delusions on testamentary capacity may be regarded as settled, since the great decision of Sir John Nicholl in 1828, in the case of Dew v. Clark, 3 Add. 79, pointed to the true distinction. Johnson v. Moore's Heirs, 1 Littell, 379; Banks v. Goodfellow, L. R. 5 Q. B. 549; per Lord Davey, in Hope v. Campbell, 1899, A. C. at page 14; Stanton v. Wetherwax, 16 Barb. at page 263; Dobie v. Armstrong, 160 N. Y. 584, 593, 55 N. E. 302; Matter of Donohue, 97 App. Div. 205, 89 N. Y. Supp. 871. In such cases it is established that, unless the delusion as to facts is such as to enter in some way into the particular dispositions of the will of the deluded person, such delusion will not in itself afford controlling evidence of testamentary incapacity. Cases supra et Thompson v. Thompson, 21 Barb. 107; Matter of Hock, 74 Misc. Rep. 15, 21, 129 N. Y. Supp. 196. In criminal law, I believe, a like result has at last been reached, and an irrelevant or collateral delusion does not relieve the perpetrator of a crime from punishment, if he is in other respects sane. It is otherwise if the delusion is an ingredient of the crime. 2 Stephens, Hist. Crim. Law, 156. No doubt delusions are one of the tests of insanity; but harmless delusions which do not unseat the mind in the daily affairs of life, and which do not enter into the fabric or constitution of the will, are not inconsistent with testamentary capacity.

Having reference to the authorities bearing on testamentary capacity and delusions, I cannot help thinking that the counsel for contestants in this cause were wise at their final argument in placing their contention on other grounds besides testatrix's legal incapacity to make her will on the 21st of October, 1908. It is to be observed that she lived on for several years after making her will, conducting her household and private affairs, and yet that she never revoked or altered the will in any respect. A great probate judge of England, Sir John Nicholl, considered this an important fact in cases of this character.

I come now to the consideration of the real contention on the part of the contestants, that the will offered for probate was the product of fraud and undue influence, exerted over a weak and feeble-minded testatrix, really incapable of an act of testamentation. Thus the allegation of testamentary incapacity, although disavowed directly, is transferred as an element of the charge of circumvention and undue influence, and it is invoked in that connection. In this aspect the capacity of testatrix must be reconsidered. The persons unquestionably pointed out as the instruments of the wrongs charged are Mr. Howard Townsend and the sister-in-law of the testatrix, Mrs. Mary Campbell, the widow of Thomas Pearsall Campbell, the last surviving brother of testatrix. Curiously neither of these persons take any real beneficial interest under the will. But Mr. Howard Townsend is the son of Mrs. Justine Van Rensselaer Townsend, one of the heirs at law and one of the next of kin of testatrix, who profits by the will. Mr. Townsend is a lawyer by profession and was professionally engaged in the preparation of the will. This fact last mentioned and the fact that he is the heir apparent of his mother are asserted by contestants to have placed him under legal obligations which were

not discharged, and which support the allegation of undue influence, and place on proponent burdens, by testamentary law, not fulfilled in this cause. Such is the substance of contestants' contention of undue influence.

Mr. Howard Townsend, the gentleman thus implicated, was not only the son of one of the principal beneficiaries under the paper propounded, but he was himself a kinsman of testatrix, standing in the same degree to her as the nearest of the contestants. For a long time prior to the death of the testatrix, he had, as a lawyer, been employed as a general supervisor of the estate of testatrix, and in this respect he unquestionably occupied a position toward testatrix somewhat intimate and at times confidential. Mr. Townsend's was not the ordinary relation of attorney to client only, but something more by reason of established family relations of an intimate and personal character. As noticed before, his mother was the first cousin of testatrix and sprung of a household greatly considered by testatrix. After the death of Mr. Pearsall Campbell, it is in evidence that testatrix took a great interest in Mr. Townsend and regarded him as the "male representative of the family." It is also apparent that testatrix was especially fond of Mr. Townsend's mother and especially fond of him. It is also in evidence that Gen. Stephen Van Rensselaer, the grandfather of Mr. Townsend; Mr. Townsend's mother, Mrs. Justine Van Rensselaer Townsend; and Mr. Townsend himself—were the kinsmen outside of her own household nearest to testatrix, in domestic association at least. Some regard must be paid to this fact when we come to consider propositions of law which originate with associations and professional relations destitute of this feature.

[14] That the ordinary professional man who takes a substantial benefit under a will, or, in other words, qui se scripsit heredem, is bound to justify in a court of probate his action, is a fair proposition of testamentary law somewhat roughly outlined. But it has its defined limitations. By the Roman law one who wrote himself heir in a will could take no benefit under such will (D. 48, 10, 15; D. 34, 8, 1); but this was not a part of the law of England, ever binding on us, nor is it now the law of this state (Paske v. Ollat, 2 Phill. 323; Matter of Will of Smith, 95 N. Y. 516). The only effect of so doing by our own law is to enlarge the burden of proof.

It is not, however, here claimed that Mr. Townsend directly wrote himself in the will of Miss Campbell as a substantial legatee, but that he wrote his mother into her will, and thus indirectly comes within the principles of testamentary law relating to one qui se scripsit heredem. This construction of the rule would seem justified in Roman law. D. 48, 10, 15. But it is to be noted at this point that Mr. Townsend's mother was a presumptive heir at law and one of the presumptive next of kin of testatrix, and that the benefit Mrs. Townsend derived by the will over her rights by law on an intestate succession to Miss Campbell was not great, being less than $100,000. The chance that Mr. Townsend might survive his mother is also to be taken into the reckoning in our consideration of the justice of the charge that Mr. Townsend really wrote himself intentionally and

unfairly into the will of Miss Campbell. Mrs. Mary Campbell, the other person charged with the exercise of undue influence, it is to be observed in this connection, really derived no benefit whatever under the will of Miss Campbell. Mrs. Mary Campbell had not even what is termed in law spes successionis, or the hope of ulterior benefit from the will of Miss Campbell. Thus this cause presents a very singular qualification of the facts ordinarily observable in the adjudications bearing on the law on this point. Is it possible that if a relative and family friend happen to be a draftsman of a will of his kinswoman and writes the presumptive heir at law of testatrix into a will to a fair extent the doctrine invoked by contestants has any application whatever?

If the law itself prefers a person by descent, can there be any presumption of unfairness against that same person in the course of a testamentary succession by that person, however induced? I take leave to doubt it. In the next place, is not an allegation of Mr. Townsend's possible hope of succession to his mother too remote for legal consideration in connection with the principle involved? Is a mere hope of succession to the last surviving of two living persons (spes successionis) to be regarded as a motive for fraudulent action in connection with the principles of law invoked by contestants? I have examined the cases cited on this point by the very able counsel for contestants, and I do not think them controlling on the facts before me. Considering the ordinary relations Mr. Townsend and Mrs. Mary Campbell occupied to the testatrix during life, I can see no valid reason for assuming that the testamentary script, propounded in this cause, was the product of either cupidity, mistaken confidence, or unfairness.

[15] That the burden of proof in testamentary causes lies in every case upon the person propounding a will, and that he must satisfy the conscience of the court that the instrument propounded is the last will of a free and capable testator, is undoubted law. If contestants intend to assert that, in every case in which the party preparing a will derives a benefit under it, the onus probandi is shifted, and that not only a certain measure but a particular species of proof is required in such cases, I have no hesitation in saying they misapprehend the law. The final rule on this point was established in Barry v. Butlin, 2 Moo. P. C., 1 Curt. 637, where many of the utterances on this point by Sir John Nicholl, cited by counsel for contestants as law, were examined and strictly limited. Barry v. Butlin has been since confirmed and followed many times by the Court of Appeals of this state. The only rule now relevant in testamentary causes where the draftsman takes a benefit under the will he writes is that it excites the suspicion of the court, and unless that suspicion be removed the court will not pronounce for the will. Barry v. Butlin, 1 Curt. 637; Durling v. Loveland, 2 Curt. 226; Coffin v. Coffin, 23 N. Y. at page 13, 80 Am. Dec. 235; Matter of Will of Smith, 95 N. Y. 516; Clarke v. Schell, 84 Hun, 28, 31 N. Y. Supp. 1053; Matter of Suydam, 84 Hun, 514, 32 N. Y. Supp. 449.

[16] I am quite willing to assume with contestants that equity regards the spirit of relations of confidence, whether such relations are technically fiduciary or not. Each case involving fraud presents peculiarities. But imposing all the burdens upon Mr. Townsend consistent with probate law, indeed, going farther, and imposing on him the "uberrima fides" of the Court of Chancery, I can detect no evidence of fraudulent dealings or conduct on his part in connection with this will before me. Nor can I perceive any evidence of fraud on the part of the very estimable lady, Mrs. Mary Campbell, who, without apparent justification, is drawn into the allegations of circumvention and imposition in this cause. Miss Campbell's testamentary bequests of the personalty proceeds closely to the statute of distributions of this state, while her devises of the realty omit only the more distant heirs at law of testatrix. On its face such a will, omitting distant relatives of testatrix cannot be said, as to the omitted relatives, to be suspicious. To be sure, the scheme of the will is not strictly harmonious with the scheme of the statute of distributions and the canons of descent in force in this state. Had it been so, the heirs would have taken by descent and not by devise. Mrs. Berry, a first cousin of testatrix, having died before testatrix, her children take under the will, while the grandchildren of several other deceased first cousins of testatrix do not take. This is the only variation from a purely harmonious scheme of testamentary succession. But there may have been reasons for this distinction. Such omitted persons are more remote by at least a degree than are the principal beneficiaries of the will.

[17] Certainly testatrix was not in duty bound to provide for all her second and third cousins in every instance. The property devised had not even come from their common stock of descent. That she did so provide in one instance creates no presumption against the will. Testatrix selected her first cousins, or those who were by law her next of kin, as the principal objects of her bounty, and only in one instance, the children of one first cousin (Mrs. Berry) were included as legatees. It should be remembered that Mrs. Berry was the sister of Mrs. Townsend and a daughter of Gen. Stephen Van Rensselaer, who had married the aunt of testatrix.

It was conceded on the argument and in the proofs that, by reason of several intervening deaths, Mrs. Justine Van Rensselaer Townsend, the mother of Mr. Townsend, would now take more if the will of Miss Campbell were rejected from probate than she would take under the will itself, and such is the fact. If her son, Mr. Townsend, were so destitute of principle as to be actuated by the sordid motives ascribed to him in the production of this will, he would not now, I think, be stoutly maintaining the will for probate. He would benefit if he survived his mother by the rejection of the will. If motives are to be inferred from benefits alone, why not also infer them from disadvantages of a pecuniary kind? But irrespective of this consideration I can detect no evidence of fraud on the part of Mr. Townsend or Mrs. Mary Campbell in respect of the will of the testatrix.

[18] I come now to the consideration of the final and most subtle

claim in the cause, viz., that the will was obtained by undue influence and unlawful importunity from an aged and feeble-minded testatrix. The finding on this allegation must stand upon the proofs; it cannot in this cause be inferred from the provisions of the will itself. Watson v. Donnelly, 28 Barb. at page 655. Before proceeding briefly to consider the legal definition of undue influence, I may observe that it is no part of the testamentary law of this state that the making of a will should originate with a testator, or that all solicitation to that end should be interdicted. Constable & Bailey v. Tufuel & Mason, 4 Hagg., 477; 1, c. 3 Knapp, 122. I cannot help thinking that contestants proceed on a contrary assumption or conflicting theory which is wholly unjustifiable by the law of this state.

[19] I have already considered the charge of fraud implied in the contestants' invocation of the rules relating to one "qui se scripsit heredem," and I have also shown that undue influence was in law a species of fraud. But undue influence is not such a species of fraud as is always provable under a bare allegation of fraud; it must, in most jurisdictions, be separately alleged (see Mortimer on Probate Law & Practice, p. 74, note), and I am inclined to think that this rule now prevails in this jurisdiction. Undue influence is, however, sufficiently alleged in this cause.

[20] In a recent case I had occasion to notice that a charge of undue influence was inconsistent with a charge of non compos mentis, which is always the gist of an allegation of testamentary incapacity. Matter of Hock, 74 Misc. Rep. 15, 29, 129 N. Y. Supp. 196. The same point had been taken in Kinne v. Johnson, 60 Barb. at page 75, on which I relied. But, no doubt, under a charge of undue influence contestants are at liberty to show mental feebleness as an element of coercion. Ingraham v. Wyatt, 3 Ecc. Rep. 168, 187, 188, 204; Kinne v. Johnson, 60 Barb. at page 75.

[21, 22] The books of the law are full of cases where undue influence has been exerted over feeble-minded persons possessed of testamentary capacity. Undue influence being, however, a species of fraud, like all other frauds it must be established by good and sufficient proofs. It is needless to say that it is not necessary to establish undue influence by direct evidence, for, like any other fraud, undue influence may be established circumstantially. Children's Aid Soc. v. Loveridge, 70 N. Y. at page 395. But it must be established in some way to be availed of either in a testamentary cause or in any other cause. Loder v. Whelpley, 111 N. Y. at page 250, 18 N. E. 874. In a case of this magnitude it is not necessary to refer further to the authorities bearing on such elementary principles of law. Nor will I attempt to collate the numberless cases defining undue influence. It will be sufficient to point out that in probate law undue influence is an unlawful coercion which destroys the free agency of a testator and thus substitutes for his free and disposing mind some will other than testator's own. The methods of accomplishing this offense against the law are sometimes very subtle, but they are never imaginative. The proofs in every case of undue influence must be sufficient to justify a conviction, and they must establish conduct inconsistent with fair dealing and

good conscience. The influence proven must amount to a legal wrong against the testator or some one who would otherwise be the natural object of his bounty. Unless there is established an invasion of a right residing or inhering in some one, there can be no conviction of undue influence. Such are some of the tests applied in the determination of a charge of undue influence.

As was well said by Sir James Hannen in Wingrove v. Wingrove (1886) 11 P. D. at page 82:

"There is no subject upon which there is a greater misapprehension than upon that of undue influence. The misapprehension * * * arises from the particular form of the expression. * * * It is not because one person has an unbounded influence over another that therefore, when exercised, even though it may be very bad indeed, it is undue influence in the legal sense of the word. A young man may be caught in the toils of a harlot, who makes use of her influence to induce him to make a will in her favor, to the exclusion of his relatives. * * * A man may be the companion of another, and may encourage him in evil courses, and so obtain what is called an undue influence over him, and the consequence may be a will in his favor."

But neither of these cases, shocking as they are, amounts to undue influence in law. "To be undue influence in law there must be—to sum it up in one word—coercion." These are exceedingly discriminating words of this English judge upon a subject which often needs discrimination. But the words of this English judge voice the deliberate conclusion of our own courts as often expressed. Children's Aid Soc. v. Loveridge, 70 N. Y. at page 394; Marx v. McGlynn, 88 N. Y. 357; Matter of Will of Smith, 95 N. Y. 516; Matter of Will of Martin, 98 N. Y. at page 196; Matter of Klinzner, 71 Misc. Rep. 620, 627, 130 N. Y. Supp. 1059. Proof of mere opportunity to exercise undue influence, the existence of confidential relations, fair solicitation by a legatee or executor, are insufficient in themselves to establish undue influence. Gardiner v. Gardiner, 34 N. Y. 155; Cudney v. Cudney, 68 N. Y. 148, 152; Post v. Mason, 91 N. Y. 539, 43 Am. Rep. 689; Matter of Patterson, 13 N. Y. Supp. 463; Blanchard v. Nestle, 3 Denio, 37; Tunison v. Tunison, 4 Bradf. 138; Hazard v. Hefford, 2 Hun, 443; Wait v. Breeze, 18 Hun, 403; Matter of Eddy, 41 Misc. Rep. 283, 84 N. Y. Supp. 218; Matter of Will of Benjamin, 136 N. Y. Supp. 1070. In the Matter of Benjamin it is to be observed that a jury afterwards came to the same conclusion on the issue of undue influence as the surrogate.

[23] It has been frequently held that a change of testamentary intention is sometimes an important circumstance bearing upon proof of undue influence. Matter of Donohue, 97 App. Div. 205, 89 N. Y. Supp. 871. In this cause now before me a claim of unexplained change of testamentary intention is a circumstance which is greatly emphasized by counsel for contestants. But what is the proof of a change of testamentary intention in this cause? It is not a former will duly executed. It is not even a writing. Miss Campbell never made any other will than this before me. It is some oral proof of Miss Campbell's intention to die intestate upon which contestants found this particular assertion. Is such proof sufficient in law to establish a testamentary intention; and again, how can an intention to

die intestate be called "testamentary intention"? The statute of wills requires wills and testamentary intentions generally to be in writing, and, except in cases of equivocation, the law permits no proof of a testator's intentions outside of the writing.

[24] The admission of oral proof to vary or explain wills has been the questio vexata of testamentary law. Volumes have been written on this subject, but the courts are as firm as the rock of Gilbraltar on this one point of law, that oral proof is inadmissible except there is an equivocation. Yet, if the contention of the contestants is accurate in this regard, a sufficient testamentary intention may be now established by parol evidence of contestants themselves, and a subsequent deviation from it may then be proof of undue influence. Such a contention seems to my mind to undermine all the foundations of the law of wills. To sanction such a rule would involve all the vice generally attributed to parol or extrinsic evidence of testamentary intention. It would leave contested wills in the hands of contestants. They would set up something only to knock it down.

While declarations of testator on an issue of mental capacity or undue influence are admissible for some purposes (Waterman v. Whitney, 11 N. Y. 157, 62 Am. Dec. 71; Marx v. McGlynn, 88 N. Y. 357; Matter of Kennedy, 167 N. Y. at page 171, 60 N. E. 442), they are not evidence of the fact stated in the declaration (Cudney v. Cudney, 68 N. Y. at page 152; Marx v. McGlynn, 88 N. Y. at page 374). How far mere oral declarations ought to be evidence of testamentary intention I confess I have great doubts. It is a general principle of law that no extrinsic evidence, however conclusive in its nature, can be admitted with a view of setting up an intention inconsistent with the writing itself. Charter v. Charter, L. R., 7 Ho. L. 364; Earl of Newburgh v. Countess of Newburgh, 5 Madd. 364; Hodgson v. Hodgson, 2 Vern. 593; Beaumont v. Fell, 2 P. Wms. 141. It seems to me that extrinsic proof of an intention not to testamentate set up against a will is inconsistent with the subsequent written will and ought to be prohibited by the spirit of the doctrine stated. In Jackson v. Kniffen, 2 Johns. 31, 3 Am. Dec. 390, a great judge of this state, Thompson, J., said:

"* * * To allow (a will) to be impeached by the parol declarations of the testator himself would in my judgment be eluding the statute" of wills.

In most of the cases where a fixed testamentary intention has been established as the basis of a charge of an unexplained change of testamentary intention, it has been so established by writing, executed pursuant to the statute of wills. Brydges v. King, 1 Hagg. 256, 310; Marsh v. Tyrrell, 2 Hagg. 84, 141; Delafield v. Parish, 25 N. Y. 85; McLaughlin v. McDevitt, 63 N. Y. at page 217; Children's Aid Soc. v. Loveridge, 70 N. Y. at page 395; Matter of Way, 6 Misc. Rep. 484, 27 N. Y. Supp. 235; Swenarton v. Hancock, 9 Abb. N. C. 326. I cannot help thinking that the language of the Court of Appeals, disapproving of oral declarations of testators as proofs of a testator's intentions in ordinary cases, might well be extended to oral declarations of an intent to die intestate (Matter of Kennedy, 167 N. Y. 170, 176, 60 N. E. 442) when offered against a subsequent written will.

But as there seems to be some authority for proof of parol testamentary intentions in cases of this kind (Tunison v. Tunison, 4 Bradf. 138, 147; Wigram, Ev. §§ 230, 1736–1738; O'Neill v. Murray, 4 Bradf. at page 323; Tyler v. Gardiner, 35 N. Y. at page 616 of dissenting opinion; Matter of Shannon, 11 App. Div. 581, 586, 42 N. Y. Supp. 670; Matter of Nolte, 10 Misc. Rep. at page 610, 32 N. Y. Supp. 226), and I have heard no argument of counsel to this proposition, I shall consider the effect of such parol evidence of Miss Campbell's intention to die intestate on the charge of undue influence.

[25, 26] But it must be remembered that it is only in case of a great change of testamentary intentions, long adhered to, and evidenced by a sudden departure from such former testamentary intentions, so long adhered to, that such change is conceded to demand explanation where the person in whose favor the change is made possesses great influence and authority and originates and conducts the whole transaction. Marsh v. Tyrrell, 2 Hagg. at page 110. Such are some of the limitations of the rule of law invoked by contestants. Now I am greatly in doubt whether the parol proof of Miss Campbell's intentions not to make a will is sufficient in this cause to require consideration.

But in any event there is no proof that such intentions of Miss Campbell to die intestate were long adhered to in the sense that they existed for a long time. Her mere passive conduct of being intestate is not to be taken as the basis of such an important inference. As matter of fact I find no substantial change of testamentary intention on the part of Miss Campbell in this cause which calls for more explanation on the part of proponent than given in evidence in the cause. If an intention to die intestate means anything, it means that testatrix wished her estate to go to those the law names in cases of intestacy. In this aspect of the will the change of intention, if any, was very slight, as the will favored those who were the nearest of living kin by law, except in one instance, where it involved the children of Mrs. Berry, only lately deceased. As to the devises of the realty, the will again follows pretty closely the prevailing canons of descent, except that the will excluded some of those who were more remote from the common stock of descent, and remote from testatrix. It is extremely doubtful, therefore, if in fact the will does evince a sudden or unexplained change of intention, within the true meaning of the rule invoked by contestants. See Matter of Green, 67 Hun, 537, 538, 22 N. Y. Supp. 1112.

[27] There is no proof in this cause of unlawful importunity. The inducement offered to Miss Campbell to make her will was, in my judgment, legitimate. Her sister-in-law, Mrs. Mary Campbell, who was seised of real property held in common with testatrix, desired Miss Campbell in a perfectly lawful way to make her will, so as to avoid the effects of an intestacy. Respectable and even eminent conveyancers advised that Miss Campbell should make her will in order to save her cotenant in common the bother and vexation incident to a judicial partition of property of great value. Miss Campbell owed that to her sister-in-law. Is such a request upon the part of a sister-in-law of testatrix, not otherwise benefited by the will, to be regarded

as that importunity which amounts to undue influence in law? If so, what safety is there in family relations, family confidence, and respect, when subjected to legal scrutiny? I see no authority for an assumption that the facts shown constitute undue influence. Nor can I detect any facts in the record which in law raise even a presumption of undue influence not rebutted.

The factum of will was sufficiently established in this cause. The actors having to do with the testamentary act were all people of the highest respectability. Neither of the attesting witnesses took anything under the will. One of them, Mrs. Mary Campbell, was excluded absolutely from the will. To be sure, she had a fortune of her own, but it was open to testatrix to give her more, as she was shown to be on terms of affectionate intercourse with testatrix. Doubtless is it that Mr. Howard Townsend, the draftsman of the will, could have thrown much light upon the inception and creation of the paper propounded, as he was its draftsman; but contestants themselves closed the door to Mr. Townsend's evidence by strenuous objections invoking the benefit of both sections 829 and 835 of the Code of Civil Procedure. It is not the fault of Mr. Townsend that proofs were not substituted for presumptions. Contestants insisted upon his incompetency to testify.

[28] By the will of testatrix Mr. Howard Townsend was given the right of nomination to the beds endowed in various hospitals by testatrix. This was claimed by contestants to make him a legatee and give him a beneficial interest in supporting the will, which excluded him under section 829, Code Civ. Proc., from giving testimony on points which were not excluded under section 835, Code Civ. Proc. The surrogate held on the spot that the bequest of such a right of presentation was not beneficial, or within the spirit of section 829, Code Civ. Proc.; that it was more in the nature of a charitable use or trust, or like an advowson in gross, or an executorship. Matter of Will of Wilson, 103 N. Y. 374, 8 N. E. 731. While the surrogate had no doubts, the proponents hesitated to rely on the accuracy of this ruling on a novel point, and Mr. Townsend then released his right of presentation and became clearly qualified to testify to matters not falling within the inhibition of section 835, Code Civ. Proc. As Mr. Howard Townsend had acted in a friendly way, or as a man of business, for testatrix, as well as professionally, in drafting her will, there was much he could testify to without valid objection. Only confidential and professional relations are to be excluded under that section. His evidence was good and frank and to the point, as far as it was allowed to proceed. But his relation as counsel to testatrix excluded much evidence.

The wisdom of excluding the testimony of lawyers who draw wills after the death of testators has been questioned. A will is a public, not a private, act in law. By the weight of authority it is held in all other states that the principle excluding evidence of confidential communications between lawyer and client has no application after the death of testators to instructions to their lawyers to draw their wills, or to the facts about the execution of such wills, and that it is

not in the interest of the testators themselves after their death to exclude evidence of such instructions or the facts about execution of the will within the lawyer's knowledge. Jones, Ev. § 755. But by the statute of New York the rule is otherwise, unless the attorney is a subscribing witness. · Westover v. Ætna Ins. Co., 99 N. Y. 56, 1 N. E. 104, 52 Am. Rep. 1; Renihan v. Dennin, 103 N. Y. 573, 9 N. E. 320, 57 Am. Rep. 770; Matter of Cunnion, 201 N. Y. 123, 94 N. E. 648, Ann. Cas. 1912A, 834. I have never esteemed it a part of the duty of a judge to criticise the policy of the law he is called on to administer, and I hope that I never shall. The collective wisdom of the state is more apt to be true in the end than that of any single individual. I endeavor always to apply statutes of this state, even if I do not quite understand their wisdom. Matter of Francis, 73 Misc. 148, 153, 154, 132 N. Y. Supp. 695. As the contestants themselves invoked the statute excluding Mr. Townsend's evidence, it is hardly fair that the contestants' claim that he has not discharged burdens of proof resting on him in this cause should receive too much weight. Matter of Will of Darrow, 95 N. Y. at page 669. But whatever the rules of law may be concerning the additional burden imposed on proponent in this cause, they have been amply and generously discharged. If I have failed to notice any arguments of counsel or any item of evidence, it is not because I have overlooked it, but because I believe such matters to be subordinate to the principles already stated in this opinion which dominate all such evidence.

The very able counsel for contestants have made a powerful presentation based on untenable inferences. They could not do more with the facts in their possession. It is impossible to fashion out of nothing a legal fabric of strength. The surrogate would consider himself highly remiss in his duty if in so clear a cause he hesitated or refused to pronounce that the factum of will had been established.

The script propounded is entitled to probate as the last will and testament of Maria L. Campbell, deceased. Let the findings and the decree to that end be presented for signature in the usual course.